THE STATE OF KANSAS v. FRANK E. WILSON.

1. INFORMATION—*Right of Defendant to Certified Copy.* A person accused of a capital crime has the right to insist that the clerk shall deliver either to him or his attorney a certified copy of the information filed against him, at least forty-eight hours before arraignment, as required by § 158 of the code of criminal procedure.

2. CAPITAL CASE—*Arraignment and Plea—Record.* In a capital case the accused must be arraigned and required to plead to the information filed against him. The record ought to show affirmatively that the accused was arraigned, and that he pleaded before trial.

3. TRIAL—*Without Certain Prerequisites—Error.* When in a capital case the record does not show either that a certified copy of the information was delivered to the accused before arraignment, or that he was arraigned and required to plead, and fails to show that he announced himself ready for trial, or in any other manner consented to a trial without a copy of the information or without arraignment, but does show that he objected to the trial continuing, and moved for a discharge for these reasons, it is error for the trial court to insist on a trial without these prerequisites. (*The State v. Cassady,* 12 Kas. 550, cited, and distinguished.)

*Appeal from Sedgwick District Court.*

PROSECUTION for murder in the first degree. At the March term, 1889, the defendant *Frank E. Wilson* was tried and found guilty as charged; new trial denied, and sentence accordingly. He appeals. The opinion contains a sufficient statement of the facts.

*Sturdevant & Sturdevant,* for appellant.

*L. B. Kellogg,* attorney general, and *W. S. Morris,* county attorney, for The State.

Opinion by SIMPSON, C.: On the 28th day of July, 1888, about 7 o'clock in the morning, the dead body of Bertha Miller, a woman of medium height, weighing about one hundred and seventy-five pounds, and described as being "very fleshy," was found in her own house on Hydraulic avenue, in the city of Wichita. This house was on the west side of a street running north and south, faced the east, and consisted of three rooms on the ground floor and one above. The north front room was a sitting-room; immediately south of and adjoining the sitting-room was a bed-room, with a communicating door between them, and in the rear of the bed-room was a kitchen. The dead body of Bertha Miller when first found by a neighbor was lying on the floor of the sitting-room, two or three feet from the door leading into the bed-room, with her head toward that door and her feet extended toward a north window in the sitting-room, face downward, the body fully extended, her right arm extended, with the fist of the right hand clutched, the other arm somewhat under her body. Her hair was very long, and thrown forward. Her face, nose, chin and breast showed distinct marks or indentations of the carpet upon which the body rested. There were no fractures of any of the parts. There were no bruises or marks of a blow about the head. There was a crease or mark about the neck that looked as if it might have been produced by a cord. There were some bruises about the neck, and distinct finger-marks about the neck and shoulders. There was a kind of cut or bruise upon the extended hand. The only clothing upon the body was a chemise and nightgown. There was a bed in the south room, and the bed-clothing was somewhat disarranged. A small revolver was found in the bed, but the record does not show whether it was loaded when found, or had been recently. There was a small tub or tobacco pail sitting in the

room, covered by a bed-quilt, and it contained bloody water. There was no blood on the body or about the rooms. One witness testified that he saw some white foam or froth on the carpet close to the mouth of the deceased. The evidence of the only medical witness that was examined was, that the woman had died of suffocation and strangulation; and he added, "In other words, you might say that she had been smothered and held down and strangled at the same time." He also stated that if a woman of her weight had fallen right on the face, and struck the face and forehead, that would have been sufficient to produce the indentations of the carpet; and that he was not able to state whether these impressions were caused by the falling of the body itself, or by an outward and external force applied after the body had fallen. When the body was first discovered, and until its removal to the place where the coroner's inquest was held, the exposed parts were very dark and much congested; but exposure to the air during removal, or some other cause, removed much of the congestion. The doctor was also of opinion from the indications that the finger-marks upon the neck and shoulder were made before death. He first saw the body about nine o'clock in the morning, and thought she had been dead from ten to fourteen hours. The neighbor who first discovered the dead body by looking in the north window of the sitting-room stated that the screen on that window was partially torn off from its fastenings and rolled up. The lower light in a front window had been broken half out, and the broken glass was lying on the inside of the house on the carpet, but the opening was so small that an ordinary-sized man could not pass through. The kitchen door was not fastened. There was some evidence tending to show that Bertha Miller was troubled with lung disease, and that she had told an acquaintance some time before her death that "she was liable to die" or drop off at any time. She was living alone, having been separated from her husband for about one year before her death. The husband testified that she had lung troubles and female weakness. So far as the record discloses, there was no robbery of the house

at the time of her death; her purse, containing some money, was found, and turned over to the sheriff.

The appellant, Frank E. Wilson, is charged with the murder of Bertha Miller. He had a preliminary examination on the 6th day of September, 1888, and on the 10th day of December following an information was filed against him. The first count charges a willful, deliberate and premeditated killing, by placing a cord or other fabric around the neck; and by drawing it tight and twisting it around did strangle and kill, etc. The second count charges a willful, deliberate and premeditated killing, by means of an assault and throwing the body down, and by pressing the face and nostrils until the deceased was strangled and choked to death. The third count charges a willful, deliberate and malicious killing, by placing a cord or some unknown fabric on and around the neck of the deceased, and by throwing the body on the ground, and by twisting and drawing tight the cord, choking and strangling her to death. At the trial the court stated in the instructions to the jury that the state had elected to stand on the second count. The appellant was convicted of murder in the first degree, and sentenced accordingly. The evidence for and against him may be briefly summarized as follows: Mrs. Mary O'Rourke testified that on the morning of the 28th day of July, between the hours of 9 and 11 o'clock, Frank E. Wilson came to her house on Ellis avenue, and said, " 'Have you heard the news?' and I says, 'No; what?' and he says, 'They have got Page in jail.' 'Page in jail,' I says; 'what for?' and he says, 'For murder.' And I says, 'Who?' and he says, 'The murder of a woman down on Hydraulic avenue last night, by the name of Miller.' I says, 'Frank, I don't believe it, for Mr. Page was at our house last night until 11 o'clock.' And he says, 'It's so; yes,' he says, 'it's so.' 'Yes,' he says, 'I have got him now right where I want him. He will get the rope, or the penitentiary for life. He has done enough with me and mine.' I says, 'Frank, that is a hard thing to say. A person is always innocent until he is proven guilty.' 'Guilty,' Wilson says; 'that letter is enough.' I says, 'What letter?'

He says, 'A letter that was found lying by the dead body's side with his name signed to it—Emanuel Page.' And I says, 'Where from?' And he says, 'From Kingman, Kansas.' I says, 'Frank, did you see that letter?' He says, 'Yes, I did.' And says I, 'Was you there?' And he says, 'Yes, I was.' 'Were there many there?' 'Yes,' he says, 'quite a good many.' 'Now take a friend's advice and keep your mouth shut, or they will arrest you.'"

To understand the force and effect of this evidence, it is necessary to state that Wilson and his wife had been living apart for some time; that the cause of that separation, as alleged by Wilson, was Page's attention to his wife. Before the time of the death of Bertha Miller, the wife of Wilson had procured a divorce from him, and had married Page. Near the dead body of Bertha Miller a letter was found, that, from the post-marks, had apparently been mailed at Kingman, Kansas, and directed in ink to Emanuel Page, Wichita, Kansas, and in pencil, 1024 N. Meade, and 605 N. Market. The letter reads as follows:

"KINGMAN, KANSAS, July 7, '88.—*Old Friend:* My luck has run high ever since I left Wichita. I have on hand about $250 in cash, and on night before last succeeded in getting two very fine gold watches. I heard you had left your family. I am glad of that. Let me know if you are still at lumber yard, for I will be down in a few days, and want you to help me to do up Wichita. Let me know if Tom went to Kansas City. Keep things as still as a mouse, and look every way for Sunday. Write immediately. I am yours, and etc.
GNT."

It is admitted that the address of this letter is a forgery; that it does not bear the mark of the Kingman post office, or the reception-mark at the Wichita post office; but that these indorsements are stupid imitations of the same. This letter was found by a policeman, and was not made public until after the arrest of Page, and that occurred some time after 12 o'clock of the 28th, and hence it is claimed that Wilson must have had some previous knowledge of the letter. His repeated threats against Page, and his knowledge of the letter

before it was made public, are the strong points against him, as elicited by the testimony of this witness. The witness, Mrs. O'Rourke, persisted in fixing the time of this important conversation in the forenoon of the 28th, and between the hours of 9 and 11 o'clock. She stated, however, that Wilson was at her house on the evening of the 28th, and stayed there until about half-past 12 o'clock, and that during his stay they talked about the murder.

On the other hand, Charles A. Parsons, a hardware merchant at 406 East Douglas, testified that Wilson was in his store the morning of the 28th, about 8 o'clock. C. L. Stancel, a clerk in a boot-and-shoe store at 118 West Douglas, testified that to the best of his recollection Wilson was at the store between 8 and 9 o'clock on the morning of the 28th, and went west from there. Mrs. Eliza Bulgamore, who resides on Vine street, in West Wichita, testified that she was well acquainted with Wilson; that he came to her house on the morning of the 28th, a little after 9 o'clock in the morning, and stayed there until after half-past eleven; that she asked him to stay for dinner, but he declined, claiming that he could get to his boarding-house in time for dinner. Miss Nettie Mermot, who resides with Mrs. Bulgamore, corroborated the evidence of that lady in every respect. Thomas Shaw, a music dealer, testified that he was at the house of Mrs. Bulgamore that day about one hour, from 10 to 11 o'clock, and that the defendant Wilson was there all that time. He fixed the date by a reference to his books, he having delivered a piano to Mrs. B. on that day.

J. W. High, a groceryman at 818 East Douglas, said that shortly after 2 o'clock on the 28th, he saw Wilson passing his door, and knowing him very well, called him in, and told him that he saw by the paper that Page had been arrested; that Wilson came into the store, and High read to him from the *Journal* the account of the arrest of Page for the murder of Mrs. Bertha Miller.

Mrs. Susan Corn testified that she lived on Hydraulic avenue — on Mosley avenue, at the time of the death of Mrs.

Miller; and that Wilson was at her house the next morning after the killing, and had eaten breakfast there; that he said he had killed Mrs. Miller, but he was drinking when he told it at the table. She was then asked by the county attorney, "What did he say?" and answered, "why, I don't remember what he did say; he was saying something about his wife and Mr. Page, and I couldn't really tell what he did say." "My husband was at the table, and the children—one child going on eleven and one nine. Do not remember the language he used with reference to the killing of Mrs. Miller." "It was early in the morning—between 7 and 8 o'clock." "The oldest child was named Kitty Corn, and is now living on Forest avenue; she was at the table and heard the conversation." "My husband heard the same talk." "Wilson was drunk." "I did not testify on the preliminary examination that Wilson said that Jack [meaning Page] and his son murdered Mrs. Miller." "I do not remember what I did tell." "He might have said something like that; I don't remember no more what he did say, it was so long." "I think Wilson was at our house again in the forenoon of that day." "I did not state at the examination that Wilson was at our house for supper; it was my husband said so." The accused, having laid the proper foundation, introduced the notes of Mrs. Corn's evidence at the preliminary examination, and from them it appears that she stated that Wilson came to her house to breakfast on Saturday morning after the body had been found, and said "that Jack and his son killed the woman; and that they were in jail." "I had not heard of the killing at that time." She made no statement about his being drunk, or that her husband and her two children heard the talk, and said she did not remember who were at home.

John Etchley, a witness, testified that just before the fair last fall he had a talk with Mrs. Corn about the Wilson case, in which she wanted to show him an agreement between a detective and her in which she was to have $500. She said that Frank had told her "that he killed Mrs. Miller, and that she might as well tell it; that Frank told her, and that she was going

to tell it." The witness did not see any agreement. The accused then offered evidence tending to show that there were rewards amounting to $1,000 for the conviction of the murderer of Mrs. Miller — $300 by the state, $200 by Sedgwick county, and $500 by Mr. Miller.

John Handley, an engineer, testified that he knew Susan Corn; that he had a conversation with her after Wilson was arrested and put in jail; that he was an acquaintance of Wilson's, and was going to the jail to see him, and stopped in at Mrs. Corn's house to see if there were any shirts for Wilson, as Mrs. Corn was doing his washing. He asked her if she had heard anything more about the murder; she said "she had; that they were getting a lot of new evidence against Wilson; that he had said enough in her house the morning after the murder to convince her that he had committed the murder; he said he had killed the woman." Witness then said to her, "I want to ask you a fair question: Did he say that he killed that woman?" She said, "No; but if I say that he killed the woman I am to get half the reward-money; and he is just as well off to lay in jail as he is to get out and get mobbed; for if he gets out of jail he will be mobbed anyhow, and he is just as well in there; and if I get half that reward-money it will do me good." He told her "it was pretty hard to swear a man's life away for a little money," and she said, "Yes, but it was pretty hard times, and she was pretty hard up, and it would help her out right smart."

Mrs. C. A. Handley testified that she was acquainted with Mrs. Corn; called on her sometime in August, after the body of Mrs. Miller was found. "We were talking about the arrest of Wilson, and I asked her if she thought Frank did the crime; she said she didn't. I told her the detectives were looking for somebody to swear, and she said they talked to her two or three hours, but that she would not swear a lie to save their lives or anybody else." The contradictory statements of Mrs. Corn, to say nothing of the testimony of Etchley and Mr. and Mrs. Handley, render her evidence unreliable.

Mrs. Wilhelma Christ, who lived on Hydraulic avenue,

about eighty steps from the Miller house, stated that at about 2 o'clock on the morning that the dead body was found, she heard some strange noises at Mrs. Miller's house; the little dog belonging to Mrs. Miller barked, and this made her own dog bark, and a short time thereafter two men came along from the direction of Mrs. Miller's house singing.

Mrs. O'Rourke also testified that on Saturday evening about lamp-lighting, "A tall, slim man that wore a cap, came to her house inquiring for Wilson;" that Wilson came presently, and she told him of this inquiry, and he went away, but returned in a few minutes, and stayed until half-past 12 o'clock.

Wm. Miller, the husband of Bertha Miller, testified that either on Saturday or Monday after the death of his wife, he found a cord in the stove in the house. The cord was one that he had used to tie the shafts of his buggy, that he had painted and brought home on the Wednesday preceding the death of his wife. He positively identified the cord as being the same one used on the buggy. When he pulled the cord out of the stove some hair came out with it, and it looked to him as if she had been combing her hair, and, taking the loose hair from the comb, had thrown the hair in the stove; the cord was on top of the hair.

J. A. McMahon testified that he was at the house of Bertha Miller on Saturday morning after the body was found; that he made a careful examination of the premises for the purpose of discovering some clews to the perpetration of the crime; that among other things he examined the stove very carefully, and he did this because of some papers he found in there, that had been recently burnt; that at that time there was no cord or hair in the stove. He was with Miller at the house on Tuesday, when Miller claims to have found the cord and hair, and is quite positive that it was not in the stove on the morning the body of Mrs. Miller was found, when he made a careful examination of the stove. On that day (Tuesday) Miller showed him a letter from a young man at Salt Lake City, that Miller claimed to have found under the carpet, and Miller remarked that the intimacy between the young man and his

wife was something he·never dreamed of. The name of the young man was Rotan.

Mrs. Miller told Mrs. Minch some time before her death that she had a gentleman friend in California by the name of Wilson, from whom she received letters. The accused had been in California, and returned about one month before the death of Mrs. Miller.

These are the material facts as developed at the trial. It is insisted on behalf of the appellant that it was error to try the accused without having served either him or his counsel with a copy of the information; that there was no arraignment; that the letter addressed to Page was not admissible against the accused without some proof that he wrote it or procured it to be written; and that the court erred in overruling his motion for a new trial.

I. We think that the clerk should have furnished a copy of the information either to the defendant or his counsel at
least forty-eight hours before the arraignment.

1. Information— This seems to be a positive requirement of the
right of de- statute, made for the benefit of the defendant,
fendant to
certified copy. and one that he can insist shall be strictly performed. Of course it can be waived by pleading and going to trial without objection; but if there was such a waiver the record ought to show it. In cases of this character, embracing the highest crime, the record ought to affirmatively disclose that every statutory step had been duly taken, or that they had been waived by the accused. The record in this case recites an objection by the defendant to trial because of a want of compliance with this statutory command; but it is urged that this objection came too late, because before it was made the jury had been impaneled and sworn to try the case. If the record had shown that the accused had been arraigned, and had announced himself ready for trial, the objection would then have been too late; but there is no recitation in the record that the accused was arraigned, or pleaded to the information.

II. The record fails to show that the accused was arraigned, or that he pleaded to the information, or that he announced

himself ready for trial, or that he consented to go to trial. After the jury was sworn, he made a motion to be discharged from custody because of the want of service of a copy of the information, and because he had not been arraigned and required to plead. His motion was too broad, but it called the attention of the court to the fact that two very plain requirements of the criminal code had not been complied with. Under these circumstances, the court could have delayed the trial until a copy of the information had been in his possession the required time, and should have had the prisoner arraigned and required him to plead to the information.

*2. Capital case —arraignment and plea—record.*

This case differs from that of *The State v. Cassady*, 12 Kas. 550, in this: that in the reported case the record affirmatively shows that the accused announced himself ready for trial, and made no objection at any time before conviction, that he had not been arraigned. In the reported case the defendant was charged with larceny only. In this case the accused is charged with the commission of a capital offense, and the record fails to show that he voluntarily went to trial, and does show that he objected to trial because he had not been arraigned. We think that the record in capital cases should affirmatively show that the accused was arraigned and required to plead to the indictment or information.

*3. Trial, without certain prerequisites— error.*

III. The only other question we shall discuss is the ruling of the trial court on the motion for a new trial. The affidavits filed in support of the motion tended to show this state of facts: That the accused knew that on the night of the death of Bertha Miller he was in the presence and sight of one Kramer until about 12 o'clock of that night; at that time he went up the stairway (with Kramer) that led to his bedroom, went to bed, and remained there until between the hours of 7 and 8 o'clock the next morning; that Kramer remained on the premises during the entire night, he being engaged in business in the store-room immediately under the bed-room of Wilson; that this is about one mile distant from

the house of Bertha Miller; that Wilson could not have emerged from his bed-room except down the front stairway adjoining the store-room of Kramer; that Kramer had occasion to go past the bed-room of Wilson several times from 12 o'clock until 7 o'clock next morning, and saw and conversed with Wilson during that time. The accused had two subpenas issued for Jake Kramer, but both were returned by the sheriff of Sedgwick county, "not found;" that Kramer's name is J. E. Kramer; that he did not know when the trial came off. This affidavit of Wilson is supplemented by one from J. E. Kramer, reciting the facts substantially as detailed by Wilson. The affidavit of Mrs. M. D. Page, the former wife of Frank Wilson, is to the effect that on the evening of the 27th day of July, 1888, at various times during the evening, she saw Wilson sitting in front of the Kramer building, where he slept, and noticed him up until sometime between 11 and 12 o'clock; and that while she was a witness for the state on the trial, she did not communicate the knowledge of this fact to either the accused or his attorneys until after the trial.

The affidavit of J. B. Williams recites that a short time after the arrest of Frank Wilson for the murder of Bertha Miller, two persons in his presence and hearing conspired together for the purpose of convicting the said Wilson, in order to get the reward; that in conversation it was agreed that one of them should confer with Susan Corn and her husband, and propose to them to swear to such facts on the trial of Wilson as would lead to his conviction; that affiant never made these facts known until after the trial.

The affidavit of Wilson shows that, with the exception of Kramer, about whose first name he was mistaken, he had no knowledge of any of these facts until after the trial.

We doubt whether, under all the peculiar circumstances of this case, this proposed evidence can fairly be called cumulative. We are inclined to think that the administration of justice can be better subserved by granting the accused a new trial, than by refusing it. The trial courts should require

that in capital cases a copy of the information or indictment should be delivered to the accused or his counsel at least forty-eight hours before arraignment. The positive command of the legislature is reason enough why this should be done. It is not the province of this court to criticise either the wisdom or policy of the legislation, but our duty is to see that such commands are obeyed. There must be an arraignment in such cases at some time before trial, apart from the positive requirement of our criminal procedure. The universal practice of all courts having criminal jurisdiction is, to give the accused an opportunity to plead. It has been almost universally held by courts of last resort that if there has been no arraignment, there is no issue made, and that a conviction under such circumstances cannot be upheld. For these reasons, in addition to the showing on a motion for a new trial, we recommend that the cause be reversed, and remanded, with instructions to grant a new trial.

As the case goes back for a new trial, it is not necessary to pass upon the instructions, except to say in a general way that it does not seem to us that there was any evidence that required the trial court to charge upon the subject of accessory or accomplice.

By the Court: It is ordered that the cause be reversed, and remanded for a new trial.

All the Justices concurring.