## THE STATE OF KANSAS v. A. W. PATTERSON.

1. CASE, *Followed.* The case of *The State v. Cassady*, 12 Kas. 550, followed.

2. CASE — *Comments.* The case of *The State v. Mosley*, 31 Kas. 355, referred to and commented upon.

3. INFORMATION — *Principal and Accessory.* Under the statutes of this state, one who procures, counsels or commands a criminal offense may be considered as principal, and may be punished as the principal, and it is not necessary to name such principal in the information or indictment.

4. TRIAL OF ACCESSORY — *Of Principal.* As an accessory before the fact may be charged, tried and convicted in the same manner as if he were principal, it necessarily follows that he may be convicted of that degree of the crime which the evidence against him establishes; and the fact that the principal, through failure of proof or caprice of the jury, has been convicted of a lower grade, or even acquitted, cannot affect the question of his guilt or innocence. (*The State v. Bogue*, ante, p. 79.)

5. ACCOMPLICE, *Testimony of.* The uncorroborated testimony of an accomplice is legally sufficient to sustain a verdict, and the degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury; but it is the duty of the trial judge in a criminal cause, if requested so to do, to advise the jury not to convict upon the testimony of an accomplice alone, unless his testimony is corroborated by other evidence as to some material fact.

6. WITNESS, *Credibility of — Instructions.* The trial judge was requested by the defendant to instruct the jury, "If any witness had been impeached in the case, they would not be justified in believing such witness if not corroborated by other evidence, circumstances and facts concerning the same matter;" also, "If any witness had heretofore made different statements under oath, they should discard and disbelieve such witness entirely, unless corroborated by other evidence, facts, and circumstances." The court refused so to do, but did instruct the jury: "You are the exclusive judges of the evidence, the facts proven, and the credibility of the witnesses; and it is for you, and you alone, to say, from the evidence, whether the defendant is guilty or not; and, if you believe any witness has sworn falsely to any material fact in this case, then you are at liberty to disregard the whole of his testimony." And: "If you should find from all the evidence that any witness who has testified in this action has heretofore been guilty of perjury in testifying falsely concerning the

The State v. Patterson.

same matters about which he has testified in this case, then, and in that event, you ought to carefully and minutely consider all his evidence in this case, and should carefully compare all his statements in this case together with all the other evidence in this case; and if, after having so done, you are unable to say whether such witness has or has not testified truthfully in this case concerning the matters about which he has testified, then, and in that event, you ought to discard and disbelieve the evidence of such witness entirely. But, if you are satisfied that any such witness has testified truthfully as to the matter in this case, then you should not arbitrarily disregard his testimony, notwithstanding you may believe that he had heretofore made a different statement." *Held*, That no error was committed, in view of the instructions given.

7. HOMICIDE — *Degrees* — *Instruction.* Where there is even slight evidence that the offense committed may have been of a lower degree than the one charged, it is proper for the trial court to give to the jury the law of such inferior offenses.

8. EVIDENCE *Sustains Conviction.* The evidence examined, and *held* sufficient to sustain a conviction against the defendant of murder in the second degree.

## *Appeal from Cowley District Court.*

ON the 18th day of March, 1893, George W. Scott, county attorney of Cowley county, filed an information in the clerk's office of the district court of that county, in words and figures as follows (omitting caption, verification, and indorsements):

"In the name, by the authority, for and on behalf of the state of Kansas, I, George W. Scott, county attorney of Cowley county, Kansas, come now here and give the court to understand, know, and be informed, that on the 7th day of January, 1892, in Cowley county and the state of Kansas, one A. W. Patterson and William T. Standeford did then and there, unlawfully, feloniously, willfully, deliberately, premeditatedly, and with their malice aforethought, make an assault upon one Peter Hinton, then and there being, and with a certain pistol, commonly called a revolver, then and there charged with gunpowder and leaden bullets, which said pistol he, the said A. W. Patterson and William T. Standeford, then and there had and held, and then and there did feloniously, willfully, deliberately, premeditatedly, and of their malice aforethought, discharge and shoot off, to, against and upon him, the said Peter Hinton; and that he, the said A. W. Patterson and William T. Standeford, with a certain leaden

bullet aforesaid, out of the pistol aforesaid, by force of the gunpowder aforesaid, by the said A. W. Patterson and William T. Standeford discharged and shot off as aforesaid, then and there, feloniously, willfully, deliberately, premeditatedly, and with their malice aforethought, with intent, him, the said Peter Hinton, in the manner aforesaid, to kill and murder, did strike, penetrate and wound him, the said Peter Hinton, upon and in the breast and body, thereby giving to him, the said Peter Hinton, one mortal wound, of which said mortal wound the said Peter Hinton then and there, on the 7th day of January, 1892, at the county of Cowley aforesaid, and within the jurisdiction of this court, instantly died, contrary to the form of the statutes of the state of Kansas in such case made and provided, and against the peace and dignity of the state of Kansas.    That the said A. W. Patterson and William T. Standeford, in manner and form aforesaid, did feloniously, willfully, deliberately, and premeditatedly, and of their malice aforethought, the said Peter Hinton kill and murder.

GEORGE W. SCOTT, *County Attorney."*

On April 18, 1893, the defendant filed a motion to quash the information, upon the following grounds:

"1.  The facts stated therein do not constitute a public offense.

"2.  The said information is not direct and certain as regards the offense and parties attempted to be charged.

"3.  The offense or offenses attempted to be charged therein is not clearly set forth, in plain and concise language, and without repetition.

"4.  The offense attempted to be charged therein is not stated with such degree of certainty that the court may pronounce a judgment thereon upon conviction, according to the right of the case.

"5.  There are two offenses attempted to be charged therein."

This motion was overruled by the court on the 22d day of April, 1893.  It appears from an affidavit on file that the clerk of the district court delivered for the defendant to D. L. Weir, one of his attorneys, a certified copy of the information on the 6th day of April, 1893.  On the said 22d day of April, the defendant was duly arraigned, and, after hearing the information read, pleaded not guilty.  Upon motion,

22 — 52 KAS.

a separate trial was granted to each of the defendants, and on the 22d day of April, 1893, the trial of A. W. Patterson, the defendant, commenced. The state appeared by George W. Scott, county attorney, and W. P. Hackney and J. C. Pollock. The defendant was present in person and by his attorneys, Messrs. Troup & Brown, and Weir & Swartz, and also by Ben. S. Henderson, Esq.

Upon the trial of this case, there was evidence introduced on the part of the state showing, among other things, that on the morning of the 6th of January, 1892, Peter Hinton, the deceased, was at the Fifth Avenue hotel, in that city, and that in the afternoon of that day he had upon his person 600 or more dollars; that A. W. Patterson was, at that time, proprietor of the Gladstone hotel, one of the principal hotels in Arkansas City, and that in the basement of the hotel there was a billiard room, a gambling room, and a "joint" where intoxicating liquors were unlawfully sold. In the operation of the gambling room, Ed. Kinney was the partner of Patterson; John Boucher had charge of the joint; Harry Holland was the barkeeper in the joint, and Charles Taylor was the dealer in the gambling room; William T. Standeford, *alias* "Missouri Bill," a brother-in-law of John Boucher, was around the joint and gambling room very much. In the afternoon of the 6th of January, 1892, John Boucher and William T. Standeford went, with another person, to the Fifth Avenue hotel, and soon after approached Peter Hinton, and invited him to take a drink with them. This he declined. They then invited him to go away from there with them. This he also declined. They then went away, but soon after returned and made inquiry for Hinton, but he was gone. Later, Hinton visited the gambling room under the Gladstone hotel, and after gambling awhile won $17. He exhibited in the gambling room a large roll of money. At that time there were present, besides Hinton, the defendant, A. W. Patterson, John Boucher, William T. Standeford, Ed. Kinney, Harry Holland, and others. About 8 o'clock P. M., Hinton went to the theater with Ed. Kinney, and stayed there

until about half past 10 o'clock P. M., when he and Kinney and John Harris left the theater and returned to the hotel, and went into the gambling room again, and engaged in gambling, at which he lost about $15. It was then about 12 o'clock, midnight, and all the parties left the gambling room and went into the joint adjoining. John Harris, who was in the joint, testified as follows:

"Ques. Who all was in that room at that time? Ans. My best recollection is, A. W. Patterson, Missouri Bill [Standeford], Harry Holland, Kinney, Kid Anderson, myself, and a kid—I don't know who he was.

"Q. What was that room used for at that time? A. For a joint.

"Q. What was Hinton doing in that room at that time? A. Drinking; the same as the rest of them.

"Q. What was the reason you left that room that night when you did? A. Because I thought there was going to be trouble—a fight.

"Q. You thought there was going to be trouble? A. Yes, sir.

"Q. I wish you would describe to the jury what took place there in that room that night that suggested to you that there was going to be trouble. A. Slapping each other's hats off and calling each other bad names.

"Q. Did they appear to be drunk—the crowd, or any of them? A. Yes, sir; some of them.

"Q. Who of the crowd appeared to be drunk? A. Why, I can't say they were drunk; they were drinking.

"Q. Boozy then? who of the crowd was boozy? A. All of them.

"Q. All the crowd? A. Yes, sir.

"Q. Who went away with you when you thought there was going to be a row? A. Ed. Anderson.

"Q. Who did you leave in the room there when you and he went away? A. Patterson, Missouri Bill [Standeford], Harry Holland, Peter Hinton, Ed. Kinney, and some kid."

Jerry Ward, merchant police, passed the joint in the basement of the Gladstone hotel about midnight on the 6th of January, and he testified as follows:

"Ans. I heard them fighting down there—like as if quarreling—some of them.

"Ques. It did attract your attention? A. Yes, sir.

"Q. What did you do? A. I listened awhile, and then walked on; and they seemed to have quieted down.

"Q. Was it loud and boisterous? A. Yes, sir.

"Q. What kind of noise was it? A. It sounded as though — I could hear John Boucher's voice as though he was trying to get at somebody to fight; quarreling with somebody.

"Q. Did you know John Boucher at that time? A. Yes, sir.

"Q. Knew his voice? A. Yes, sir."

A. Abbott, a resident of Arkansas City, testified that,

"About midnight of January 6, he was on the sidewalk in front of the Gladstone hotel. He heard loud swearing in the basement of the hotel, and went to the door of the joint."

"Ques. What room was the noise being made in at that time? Ans. In the joint.

"Q. Now what did you hear while standing there? A. Well, there was cussing and swearing, and when I stepped to the door somebody says, ' The son of a bitch has cut me,' and I stepped to the door and then took hold of the knob and found the door was fast.

"Q. What else did you hear? · A. Then somebody else says, 'Why don't you kill the son of a bitch?' or 'Go and kill the son of a bitch,' or something like that; I would not swear positive what it was."

Ed. Kinney testified as to the occurrences in the joint as follows:

"Ques. You may state what you saw that attracted your attention. Ans. Well, sir, I was out in the hotel. I heard some loud talking and quarreling. I think I was in the billiard room — had walked in there — and I went back into the joint room; and Hinton stood to the right of the door, Boucher stood in front of him, and Hinton had his back to the wall, and Boucher stood in front of him and insisted on licking Hinton, and Hinton didn't want to fight — said he didn't want to fight — and Boucher was going to lick him anyway, and did commence punching him; and they scuffled around there a little bit, and Hinton struck at Boucher. I think he had a knife in his hand, but I can't say positive that I saw the knife. Boucher jumped back, and run around behind the table and commenced throwing beer bottles at Hinton,

and Hinton retreated into a corner to the left, behind the door. I think Boucher threw one or two bottles at him and struck close to him or hit him, I don't know which, and then Hinton went to the door and tried to get out, and Boucher kept throwing beer bottles at him, but Hinton finally got out and run.

"Q. How was the door, as to being locked or otherwise? A. It was locked with a spring lock.

"Q. What happened after that? A. After Hinton left, Boucher said, 'The son of a bitch has cut my hand,' or ' He cut me with a knife,' I am not positive which. They gathered around Boucher to look at his hand, and Patterson says, 'Why don't you kill the son of a bitch?' Boucher says, 'I haven't any gun,' and Patterson says, 'I will go and get you a gun,' and turned around and went out the same door that Hinton did; and Standeford and Boucher stayed there for perhaps a minute, and they went out the other door.

"Q. Well, where did you stay? A. I stayed there.

"Q. Who was in there then besides you? A. Harry Holland.

"Q. What next happened? A. Holland and I stayed there talking, and we heard the report of — as we talked — of a pistol."

Jesse Feagans, a policeman in Arkansas City, testified:

"Ques. Do you know the defendant, A. W. Patterson? Ans. Yes, sir.

"Q. Do you know one W. T. Standeford, otherwise called 'Missouri Bill'? A. Yes, sir.

"Q. Did you know John Boucher? A. Yes, sir.

"Q. Did you know Peter Hinton in his lifetime? A. I can't say that I did.

"Q. Did you see Peter Hinton before he was killed? A. Yes, sir; it proved to be him afterward.

"Q. Did you see him killed? A. Yes, sir.

"Q. What time in the day or night were you to go on duty? A. Twelve o'clock.

"Q. Day or night? A. Night.

"Q. How long did you remain on duty? A. Till next day 12.

"Q. On the night referred to — this night between the 6th and 7th days of January, 1892 — what time did you go on duty that night? A. I think about 12 o'clock.

"Q. Then where did you go? A. Started to the Saddle Rock restaurant.

"Q. For what purpose? A. For a lunch.

"Q. Did you see anybody that attracted your attention while you were in that Saddle Rock restaurant? A. John Boucher.

"Q. What was he doing? A. He looked in. He looked frightened and kind of like as if he had been drinking some. He attracted my attention, and I asked him what was the matter, and if anything was wanted, and he said 'No,' he was looking for a party.

"Q. Then what did you do? A. He pulled the door to, and as he pulled it to I held to it, and he went out of the doorway and went south, and we all three came out and walked after him as far as police headquarters, and went up stairs. Soon afterward I put on my overcoat and started over to the Central to get a deck of cards.

"Q. State how you went. A. I came down to the corner, and out and across like, and I passed south from four or five feet from the corner, and saw Peter Hinton, as I since learned, leaning with his left shoulder against a post.

"Q. Facing which way? A. Northeast. His head was sort of downward. John Boucher was standing with him like. I came down here, and walked right past that gentleman, and came over here. When I got to the center of this street here, I heard those men say something, and I looked, and I turned around to see what the trouble was; and then there was a silence, and I walked out to here, and when I got here I saw two men come walking up from the north and stop there — north to this Bonsall building — here.

"Q. What did those two men do? A. They stopped over here.

"Q. In front of that building? A. One of them stepped right into the recess here, and the other one stood down against the door.

"Q. Where were you when you saw them? A. When they came walking up here, I was just here; about here, somewhere. I did n't go clear to this point, and I went straight across to those men. Boucher said, 'My name is John Boucher; my name is John Boucher'—this last time growing angry; and I thought these men, one of them, was the night police, who would come on about that time.

"Q. What was the name of the policeman you expected to find there? A. George Bean. I thought I would go over

to this policeman, and, if they did n't quit, we would take them to jail.

"Q. And when you got over there, who did you find it was? A. Missouri Bill [Standeford] and Mr. Patterson.

"Q. The defendant here? A. Yes, sir.

"Q. Whereabouts was the defendant? A. He was standing in the recess of the door.

"Q. Whereabouts was Bill Standeford, or 'Missouri Bill,' as you call him? A. He was standing right against the facing, on the pavement.

"Q. Go and tell what took place. A. When I turned up here to these men, at first I thought it was the night policeman, and when I turned here my back was to Boucher and Hinton, and I could not find out who Missouri Bill was. I thought he looked like Johnnie Miller. He had his hat sort of down, and had on a black hat. I knew Patterson when I put my eye on him; knew who it was when I saw him, but I did n't know Missouri Bill, and I said, 'Who is it?' and before I said that he kinder backed off and looked up, and it was Missouri Bill.

"Q. Backed off which way? A. Just kinder backed off north, and I took a match out to see who it was, and I said, 'Who's this?' and he said, 'Me,' and as he said that I knew him. Just as he said, 'It's me,' John Boucher said over here, 'You are the son of a bitch that cut my hand. I have a notion to kill you; I will do it,' and, as I turned to go, Missouri Bill said, 'Be careful,' and Boucher fired the shot, and Hinton fell here.

"Q. Did you hear the other man, when you heard Boucher say, 'You are the son of a bitch that cut my hand;' did you hear the other man say anything? A. When he says, 'You are the son of a bitch that cut my hand; I have a notion to kill you; I will do it,' Hinton said, 'If you are going to do anything, do it. I have got to hunt a doctor and get my head done up.'

"Q. When Hinton said, 'If you are going to do anything, do it. I have got to hunt a doctor and get my head done up,' he threw his hands up again, did he? A. Yes, sir.

"Q. How long after he said that was it before Boucher fired? A. Well, he had just got the words out of his mouth. Just as he got the words out of his mouth Boucher fired, and he [Hinton] said 'Oh, oh!' and fell back.

"Q. How long did he live? A. Probably three minutes.

He died just as fast as a man could die after being shot right down.

"Q. What did you find on his person? A. I found four five-dollar bills in his right pocket.

"Q. How were they done up? A. All squeezed up.

"Q. What else? A. Two twenty-dollar bills, in his pocket, inside—in the right pocket inside.

"Q. What else did you find? A. I found $7.65 in silver, I found in this pocket, and a pocket knife.

"Q. What condition was the knife in, as to being open or shut? A. Shut.

"Q. What condition otherwise? A. It had some blood on it.

"Q. What else did you find? A. I think this comb and toothbrush.

"Q. Did you take charge of those things? A. Yes, sir; I think it was full charge.

"Q. What else did you find on his person? A. I believe that was all.

"Q. Did you make a thorough search of his person? A. Yes, sir; it was done for that purpose.

"Q. Was that all the money you found on his person? A. Yes, sir."

After the killing of Hinton by Boucher, Patterson, Standeford, Boucher, Harry Holland and Ed. Kinney were at the joint again under the Gladstone hotel, and as to what then took place Ed. Kinney testified as follows:

"Patterson, Boucher and Missouri Bill were in behind the table that was used for a bar, talking among themselves. They talked a little while there, and Boucher and Missouri Bill went out, saying they were going home, and went out the south door, and, I suppose, they went home. Harry Holland and Patterson and myself stayed there. After they went out, Patterson says, 'Where's my gun? What did Boucher do with my gun?' And I said I had given it to Black, upstairs. He turned around and went out, I suppose up into the office. He went out and came back with the same gun, I think, that I gave Black, and kinder set up on the table that was used for a bar, and took the cartridges—I think there were two or three cartridges—and threw them over into the slop bucket, and took the full cartridges and put them in his pants pocket, and shoved the gun down in here [witness il-

lustrating], and we sat there talking—merely talking; and I think that the conversation came up in regard as to whether Patterson had seen Boucher kill Hinton, and I think that Patterson pictured the manner of the killing to me; I am not positive, but I think he did. He said, 'That Boucher made him throw up his hands, stuck the gun up to him, and pumped it into him, and the son of a bitch bellowed like a calf.' We stayed there some little time, and he suggested and advised Holland and me; he said, 'By God, we would all have to stay together, or every God-damned one of us would go to the pen., and he suggested, 'That a quarrel arose about some wet horses [stolen horses].' We sat a little while there, and talked the matter over, and I did n't talk with anybody else about it until I got up on Fourth street.

"Q. Was it agreed there between Patterson and you and Holland to make up this story about the wet horses and stick to it, in order to shield Patterson and yourselves—Boucher, Patterson and yourselves? A. To shield Boucher, Patterson—

"Q. And you and Harry Holland? Was it purposely made up, for the purpose of shielding you? A. It was; yes, sir. It was talked over that we would all have to stand together, and simply to shield Boucher—put him in the best light we possibly could; and, of course, when we shielded Boucher we shielded everybody else.

"Q. Have you had any conversation with Patterson since that time with reference to your getting out of the country? A. Yes, sir; quite often.

"Q. What did he say about it? I mean Patterson now, the defendant. A. Why, the substance of all his conversation was, that 'I knew too God-damned much about the Boucher case.'

"Q. That was what he said to you? A. Yes; the substance.

"Q. What did he say about your going away? A. 'That I had better go to New York.'

"Q. Did he say that more than once? A. Oh, yes.

"Q. I will ask you to state whether or not he ever gave you any money to leave, in order to keep you from being a witness here? A. Yes, sir; he did.

"Q. Where was that at, and how much money did he pay you? A. He gave me $40 in Wichita to go to New York with.

"Q. What did he say when he gave you the money? A. He just said: 'Take this; get out of the country; leave to-night.' I told him I would, and that I would be in Kansas City before morning."

The jury returned a verdict of guilty against the defendant of murder in the second degree. Thereupon the defendant filed a motion in arrest of judgment, which was overruled. He also filed a motion for a new trial, which was overruled. Subsequently the defendant was sentenced, upon the verdict of the jury, at hard labor and close confinement in the penitentiary of the state for a period of 12 years, and to pay the costs of the prosecution, taxed at $1,217.05. To the rulings, sentence and judgment of the court the defendant excepted, and appeals to this court.

*Troup & Brown, Weir & Swartz,* and *Ady, Peters & Nicholson,* for appellant.

*John T. Little,* attorney general, and *George W. Scott,* county attorney, for The State; *John C. Pollock,* and *W. P. Hackney,* of counsel.

The opinion of the court was delivered by

HORTON, C. J.: I. It is insisted that the record in this case does not show that the defendant was furnished with a copy of the information, or waived it at any time before going to trial; also, that the record fails to show the defendant was ever arraigned or pleaded to the information, and, therefore, that there was a mistrial, and the judgment should be reversed. Upon the hearing, a diminution of the record was suggested, and, with the consent of this court, the transcript has been amended so as to speak the truth. According to the transcript, as corrected, it appears that, on April 22, 1893, the defendant was personally present in court and required to plead to the information. It was read to him, and he pleaded not guilty. This was before the trial. The record, therefore, shows his arraignment and plea. The record also shows that the jury was duly impaneled and sworn, and that the

defendant was personally present in the court during the trial. An affidavit has been filed with the transcript showing, as a matter of fact, that the clerk of the court made out and delivered to the counsel of defendant a copy of the information on the 6th day of April, 1893, several days before the trial. If, however, the affidavit be disregarded because not properly incorporated in the transcript, it is sufficient answer about the nondelivery of a copy of the information to call attention to § 158 of criminal procedure, which provides: "If the defendant pleads and goes to trial, without objecting for the want of a copy of the information, the neglect of the duty by the clerk will not be sufficient ground to set aside the verdict." (*The State v. Cassady,* 12 Kas. 550.) In *The State v. Wilson,* 42 Kas. 587, the record did not show that the defendant had been arraigned, or that he had announced himself ready for trial. In that case, also, the defendant made a motion to be discharged from custody because of the want of the service of a copy of the information, and because he had not been arraigned and required to plead.

II. It is next insisted that the information did not state facts constituting a public offense; that it was not direct and certain as regards the offense and parties attempted to be charged; and that the offense attempted to be charged was not clearly set forth in plain and concise language, and without repetition. Objection was taken to the information, not only by motions to quash and in arrest of judgment, but also by objecting to the introduction of any evidence that any person or persons, other than the defendant or Standeford, were guilty of the homicide complained of, and also by requesting instructions to the same effect. Upon the trial, it was shown by the state that at the time Peter Hinton was killed John Boucher held the pistol in his own hand and fired the shot which caused his death. The real contention is, that neither the evidence introduced upon the part of the state, nor the instructions given to the jury, were applicable to or embraced the offense charged. It is urged that the guilt of Boucher should have been averred, and the act of the defendant in

counseling him to commit the homicide should have been stated in the information. Counsel overlook or do not give sufficient force to § 421 of the crimes act, § 115 of the criminal code, and the decisions of this and other courts upon these sections. The first section reads:

"Every person who shall be a principal in the second degree in the commission of any felony, or who shall be an accessory to any murder or other felony, before the fact, shall, upon conviction, be adjudged guilty of the offense in the same degree, and be punished in the same manner, as herein prescribed with respect to the principal in the first degree."

The second section provides: "Any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner as if he were a principal." In *The State v. Cassady*, supra, in referring to these sections, this court said:

"The intention of the legislature in these sections is obvious. It authorizes the charging of an accessory before the fact as principal. . . . Section 10 of the bill of rights does not attempt to require that the particular connection an accused has with the offense charged shall be stated in the indictment or information. It does not attempt to indicate how much of detail or specification is essential to a criminal pleading. . . . The legislature has not attempted to say that the crime committed shall not be charged; that the 'nature and cause of the accusation' shall not be stated, but has simply declared what acts shall render one guilty of this crime. The one acting, the one present aiding and abetting, and the one absent counseling, aiding, and abetting, are declared to be equally and alike guilty. Nor is this the introduction of a new or harsh rule. At common law, if two engaged in the commission of an ordinary felony, and in furtherance of it one committed murder, both were declared equally guilty thereof. The common consent to do wrong rendered each responsible for all acts done in furtherance of the wrongful purpose. Under our statutes, one indicted for an offense consisting of different degrees may be convicted of the degree charged, or of any degree inferior thereto, or of an attempt to commit the offense. (Crim. Code, § 121.)"

Bishop, in his work on Criminal Procedure (vol. 2, 3d ed.,

§ 3) says: "So A. and B., if present, aiding and abetting, may be convicted, though C., a person not named in the indictment, committed the act."

In *The State v. Jones*, 7 Nev. 408, Lewis, C. J., observed "that the jury learned from the charge that it is always essential there be a principal in the crime, although under the statute of this state it is not necessary that he is convicted of the crime, or that the accessories be indicted as such; for it is expressly provided that they may be indicted and tried as principals."

In *Spies v. The People*, 122 Ill. 1, the court stated:

"Under our statute and the construction given to it by the decisions of this court, the man who, 'not being present, aiding, abetting, or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime,' may be considered as the principal, and may be punished as the principal. The indictment need not say anything about his having aided and abetted either a known or an unknown principal. It may simply charge him with having committed the murder as principal. Then if, upon the trial, the proof shows that he aided, abetted, assisted, advised or encouraged the perpetration of the crime, the charge that he committed it *as principal* is established against him. It would make no difference whether the proof showed that he so aided and abetted, etc., a known principal or an *unknown* principal."

*The State v. Mosley*, 31 Kas. 355; *The State v. Brown*, 21 id. 50; *People v. Outeveras*, 48 Cal. 19; *Baxter v. The People*, 3 Gilm. 381; *Dempsey v. The People*, 47 Ill. 323; *The State v. Orrick*, 17 S. W. Rep. (Mo.) 176; *The State v. Fredericks*, 85 Mo. 150; *The State v. Anderson*, 89 id. 333; *The State v. Rucker*, 93 id. 89.

III. It is also insisted that the trial court erred in admitting the statements of Boucher, made to Kinney, after the killing was over—not in the presence of the defendant— "that he had killed Hinton," and "you take that gun and give it to Patterson." Under the authority of *The State v. Bogue*, ante, p. 79, it may be conceded that the first statement was inadmissible. The question, therefore, arises, was it material or prejudicial? The record is full of evidence that Boucher

killed Hinton. One of the witnesses for the defendant stated that "Boucher killed Hinton," and the defendant offered the record showing that Boucher not only killed Hinton, but that he was convicted therefor of manslaughter in the third degree, and sentenced to the penitentiary for a term of three years. The same witness who testified about the statements of Boucher also testified that the defendant said in his presence, in substance, that Boucher made Hinton throw up his hands, stuck the gun up to him, and shot him. After the evidence had all been introduced, there was no controversy over the fact that Boucher killed Hinton. The only dispute was, under what circumstances the homicide occurred — whether it was justifiable, excusable, or felonious. We think, therefore, the statement referred to was neither material nor prejudicial. The statement of Boucher to Kinney, "to take the gun and give it to Patterson," was not a narrative of a past event; it was merely a direction for Kinney to give the gun he had to Patterson. It was not a statement that it was Patterson's gun, or that Patterson gave him the gun. Kinney testified "that after this statement of Boucher to him, he walked into the office of the Gladstone hotel, went up to the counter, and gave the gun to Black, the clerk." If there was nothing else in the record but this statement to indicate that Patterson furnished the gun for Boucher, his connection with that part of the transaction would be slight — surely not enough to support a verdict of guilty, or any conviction; but the same witness who testified to the direction of Boucher also testified that the defendant suggested to Boucher, before he left the joint, "Why don't you kill the son of a bitch?" (meaning Hinton,) and when Boucher said "I haven't any gun," the defendant said "I will go and get you a gun," and went out of the joint at once; that after the homicide was committed, and when several of the parties were in the joint, the defendant said: "Where's my gun? What did Boucher do with my gun?" And when told that it had been given to Black, the clerk at the office, he went out and came back with the same gun, as the witness thought; took the cartridges out; those that were

empty, he threw into the slop bucket; those that were full, he put in his pants pocket; then he put the gun away, and detailed, as before stated, how Boucher shot Hinton with the gun. Even if the direction of Boucher be regarded as inadmissible, the other evidence of the witness testifying to this, if given credit, connected the defendant so strongly and directly with furnishing the gun to Boucher, that such mere direction was not important in the case — not sufficient to influence a verdict.

IV. It is further insisted, that the defendant, if an accessory before the fact, could not be visited with a higher grade of punishment than his principal. John Boucher was convicted of manslaughter in the third degree only, and sentenced at hard labor in the penitentiary of the state for three years. In *The State v. Bogue*, ante, p. 79, it was said:

"It may be conceded that, at common law, the acquittal of the principal acquitted the accessory also, and that the conviction of the principal must precede or accompany that of one charged as an accessory. Section 115 of the criminal code provides: 'Any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner as if he were principal.' The evident purpose of the legislature of our own and other states where similar statutes have been enacted was to do away with those subtle distinctions of the common law between principals in the first and second degree and accessories before the fact, and to permit the trial of participants in the crime independently of each other, so that each should suffer punishment for his own guilt, without being dependent on the result of the prosecutions against others. . . . We think a guilty accessory may be punished, even though the principal escape."

In *Goins v. The State*, 46 Ohio St. 467, it was observed:

"If, as has been held, this crime is a substantive one, for which the offender may be tried and convicted before the conviction of the principal, it necessarily follows that he should be convicted of that degree of the crime which the evidence against him establishes; and if this may be done before, no reason is apparent why it should not be done after, the trial of the principal; and the circumstance that the principal of-

fender, through failure of proof or caprice of the jury, had been convicted of a lower grade, or even acquitted, before the aider or abetter was put on trial, cannot affect the question of the guilt or innocence of the latter. The degree of the guilt of the aider and abetter, as well as the question whether he is guilty at all, is to be determined solely by the evidence in the case."

But counsel for defendant claim that the decisions referred to apply to an aider, an abetter or principal in the second degree only, and not to an accessory before the fact. By the statute of this state, the distinction between a principal in the second degree and an accessory before the fact has been abolished, and all participants in a crime are declared equally and alike guilty, without regard to their proximity thereto or the extent of their participation therein. (*The State v. Cassady,* supra.) In this connection, it is proper to remark that, in the case of *The State v. Mosley,* 31 Kas. 355, it was rightly decided that " Upon the trial of an accessory before the fact, the record of the conviction of the principal is proof *prima facie* of that fact; but this is not conclusive, and other evidence of the commission of the crime by the principal is admissible." But this court probably went too far in that case, in saying that the statements of the principal, Mrs. Martin, were admissible against Mosley, if they were made in his absence. At common law, such statements of a principal were admissible to charge an accessory, but under our statute and the authority of *The State v. Bogue,* ante, p. 79, such declarations, not made in the presence of the accessory, are not receivable.

V. It is still further insisted, that the trial court committed error in "permitting the case to go to the jury upon the evidence of Kinney, without saying to them that they should not convict upon the uncorroborated evidence of an accomplice;" also, that the court "abused its discretion in not instructing the jury that they ought not to find the defendant guilty upon the statements of Kinney alone." The court gave, among others, the following instructions:

" If you should find from all the evidence that any witness

who has testified in this action has heretofore been guilty of perjury in testifying falsely concerning the same matters about which he has testified in this case, then, and in that event, you ought to carefully and minutely consider all his evidence in this case, and should carefully compare all his statements in this case together with all the other evidence in this case; and if, after having so done, you are unable to say whether such witness has or has not testified truthfully in this case concerning the matters about which he has testified, then, and in that event, you ought to discard and disbelieve the evidence of such witness entirely.    But, if you are satisfied that any such witness has testified truthfully as to the matter in this case, then you should not arbitrarily disregard his testimony, notwithstanding you may believe that he had heretofore made a different statement.    In determining what weight should be given to the testimony of any witness, the jury may take into consideration the appearance of such witness on the witness stand while giving his testimony, the interest of such witness, if any, in the result of the case, and any other fact or circumstance proven in the case, which, in the opinion of the jury, throws any light upon the question of the weight which should be given to the testimony of such witness.    You are the exclusive judges of the evidence, the facts proven, and the credibility of the witnesses; and it is for you, and you alone, to say, from the evidence, whether the defendant is guilty, or not; and if you believe any witness has sworn falsely to any material fact in this case, then you are at liberty to disregard the whole of his testimony.    If there be any reasonable doubt whether the guilt of the defendant has been satisfactorily shown by the evidence, he should be acquitted.    If any one of the jurors, after having considered all the evidence in the case, and after having consulted with his fellow-jurymen, should entertain any reasonable doubt of the guilt of the defendant, then the jury cannot find the defendant guilty.    The defendant is presumed to be innocent, until the contrary is proven, and, where there is a reasonable doubt whether his guilt is satisfactorily shown, he must be acquitted."

Counsel say that the verdict in the case, resting upon the evidence of a witness like Kinney, whose character is so atrocious, whose motive for lying is so apparent, and who confesses his own perjury with regard to the same transaction on two former occasions, is not properly supported, and that the

liberty of no one should be cast away in such a manner. The degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. Without doubt, great caution in weighing such testimony is dictated by prudence and good reason. (1 Greenl. Ev., § 380.) In *The State v. Adams*, 20 Kas. 327, it was stated that "the unaided testimony of an accomplice is legally sufficient to sustain a verdict." In *Collins v. People*, 98 Ill. 584, it was observed:

" In many, probably in most, cases, the evidence of an accomplice, uncorroborated in material matters, will not satisfy the honest judgment beyond a reasonable doubt; and then it is clearly insufficient to authorize a verdict of guilty. But there may frequently occur other cases, where, from all the circumstances, the honst judgment will be as thoroughly satisfied from the evidence of the accomplice of the guilt of the defendant as it is possible it could be satisfied from human testimony; and, in such case, it would be an outrage upon the administration of justice to acquit."

In *Lindsay v. People*, 63 N. Y. 143, it was said:

"Although it is not usual to suffer a conviction upon the wholly uncorroborated evidence of an accomplice, and juries are advised not to convict without a confirmation as to the material facts, still, if the jury are fully convinced of the truth of the statements of a witness thus situated, they may convict upon his testimony alone. It is the duty of the trial judge, if requested so to do, to advise the jury not to convict upon the testimony of an accomplice alone, unless his testimony is corroborated by other evidence in some material point in issue."

See, also, *The State v. Kellerman*, 14 Kas. 135; *The State v. Adams*, supra.

In this case, Kinney was the accomplice or a *particeps criminis* only after the fact, by agreeing to and subsequently swearing to fabricated statements at the coroner's inquest and the preliminary examination of Boucher. It is not shown that he was present, aiding or abetting the homicide, or that he procured, counseled or commanded it. He was, at most, an accessory after the fact. The trial court was not requested,

by the defendant or his counsel, to advise the jury not to convict the defendant upon the uncorroborated evidence of an accomplice. Instructions one, two, three, and nine, which were requested and refused, referred to any impeached witness and to any witness who had heretofore made different statements under oath. The court said to the jury,

"You are the exclusive judges of the evidence, the facts proven, and the credibility of the witnesses; and it is for you, and you alone, to say, from the evidence, whether the defendant is guilty or not; and if you believe any witness has sworn falsely to any material fact in this case, then you are at liberty to disregard the whole of his testimony."

The court also cautioned the jury that, if any witness had been guilty of perjury in testifying previously concerning the facts at issue, they ought to carefully and minutely consider such evidence, and carefully compare the statements testified to with all the other evidence, and if, having done so, they were unable to say whether the witness had or had not testified truthfully, then they ought to discard and disbelieve the evidence of such witness entirely. In view of the special instructions requested, and the instructions actually given, the trial court seems to have advised the jury to discard and disbelieve the witness Kinney, if not thoroughly satisfied that his evidence upon the trial was truthful, and that they were at liberty to disregard his whole testimony, if they believed he had sworn falsely to any material fact.

VI. Again, it is insisted that, upon the evidence of the state, the defendant was guilty of murder in the first degree; therefore, that the trial court committed grievous error in instructing the jury they might find him guilty of murder in the second degree, or of manslaughter in the third or fourth degrees. *The State v. Whitaker*, 35 Kas. 731, and other similar cases of this court, are cited. It was proper for the trial court to give instructions upon the theory of the defendant, as well as that of the state. The defendant himself and other witnesses testified that when Hinton left the joint, after the fight there, he said to Boucher "that he would kill him;" that

soon afterward the defendant met Hinton upon the street with his knife, and that Hinton said "he would be revenged upon Boucher; that he would never sleep until he killed him;" and that soon afterward there was a fuss or quarrel on the street between Boucher and Hinton, in which Hinton was killed.   All of this, and other evidence introduced upon the part of the defendant, tended to show that Boucher was justified in killing Hinton, or was guilty of some offense less than murder.   This also tended to show that Patterson was either not guilty, or, if guilty at all, guilty in a less degree than charged.

VII.  As to the complaint of the instruction about counseling, aiding or abetting the commission of the offense charged, see *The State v. Shenkle*, 36 Kas. 45.

VIII.  Another claim is that, if all of the other alleged errors in the record were unavailing, the verdict should be set aside, and the judgment reversed, on account of the closing argument for the state.   Four specific objections were made during the argument, and a general objection at the close.   Two of the objections concerned wholly immaterial matters not prejudicial.   One statement complained of was: "They would not let us prove that the officers of the law were after one of the witnesses for the same crime, whose testimony they introduced."   The second was: "That the commissioners of Cowley county, in their public capacity, made an order employing John Pollock and W. P. Hackney to prosecute the case, and did it in the obedience to public sentiment;" yet those statements, according to the affidavits on file, were partly made in answer to remarks of counsel for the defendant.   The third objection made was sustained by the court.   After this objection was sustained, counsel said: "I will take that back, and strike it all out."   At the time the fourth objection was made, counsel was commenting upon the fact that the defendant, although having lived in Arkansas City for 23 years, had introduced no witness to testify to his good character.   The court sustained the objection to these remarks, and thereupon the counsel said, "I withdraw them."

But see *The State v. Yordi*, 30 Kas. 224. In the general objection no particular sentence or specific part of the argument was indicated, but the court was asked "to caution and admonish the jury not to be misled by the intemperate and inflammatory speech of the counsel who closed for the state, nor to the statements of that counsel out of the record, or to any of the incompetent statements that have been made in this case." The court, in reply, said to the jury:

"So far as any question of intemperate speech made to close the argument here, the court had no just criticism to make; however, if, in your judgment, the counsel closing this case has made any remarks, or said anything, that is out of the record, then, and in that event, the court tells you not to permit such statements to come before you in any way. Of course, you will try this case according to the law and testimony alone."

The final objection to the argument, at the close of the case, was too general. This court has decided several times, that even if the statements of counsel are improper, if no sufficient objection is made at the time, error will not lie. (*The State v. Wilgus*, 32 Kas. 126; *The State v. Nusbaum*, ante, p. 52, [34 Pac. Rep. 407,] and cases cited; *The State v. Comstock*, 20 id. 654; *The State v. Mortimer*, 20 id. 93; and *The State v. McCool*, 34 id. 613.)

IX. Lastly, it is insisted that a new trial should be had, on account of newly-discovered evidence. A part of this evidence was cumulative only; the other parts were answered or contradicted by counter affidavits. There was no error on the part of the court in refusing the new trial for this reason. (*The State v. Rohrer*, 34 Kas. 427; *The State v. McCool*, supra; *The State v. Smith*, 35 Kas. 618; *Douglass v. Anthony*, 45 id. 439.)

In this case, unlike some criminal cases that have been before us for review, there was direct and positive testimony before the jury to sustain the conviction of the defendant, if that evidence was believed. The jury were the exclusive judges of the evidence, and of the credibility of the witnesses.

We have before us the verdict of the jury, and also the approval of the trial judge of that verdict. We cannot interfere. There are other matters discussed in the briefs, but we do not think it necessary to comment thereon.

The judgment will be affirmed.

All the Justices concurring.