## Court of Appeals.

### (October 13, 1896.)

### PEOPLE v. ARTHUR MAYHEW.

**1. Evidence—Accomplice—Corroboration.**

It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime.

**2. Same.**

The corroborative evidence need not be wholly inconsistent with the theory of the defendant's innocence. If the trial judge is satisfied that there is testimony tending to connect the defendant with the commission of the crime, as the statute requires, he is bound to submit the case to the jury, who are the sole judges whether the evidence relied upon to corroborate the accomplice is sufficient.

**3. Same.**

Though the conviction of the defendant would not have been possible in the absence of the testimony of the accomplice, evidence offered on behalf of the defendant to the effect that certain disreputable companions of the accomplice were, on the night of the murder, spending money freely in certain saloons, and then next day at a hotel, is inadmissible.

Appeal from a judgment convicting defendant of murder in the first degree, and from an order entered on the minutes denying a motion for a new trial.

John B. Merrill, for appellant.

Daniel Noble, Dist. Atty., for the People.

BARTLETT, J.   The defendant, a colored man, stands convicted of murder in the first degree under the second count of the indictment found against him, which charges that he killed one Stephen Powell while engaged in the commission of the crime of robbery.   John Waynes, also a colored man, was jointly indicted with the defendant, but demanded a separate trial.   This alleged accomplice of the defendant was the principal witness for the people, and it is undisputed that the conviction of the defendant would not have been possible in the absence of this testimony. The case was tried with great fairness, and there are no exceptions that are seriously presented to us as calling for a reversal of the judgment.

The important question is whether the testimony of the accomplice was so corroborated as to sustain the verdict of conviction. The Code of Criminal Procedure provides as follows:   "Section 399.   A conviction can not be had on the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."   It therefore becomes important to examine the corroborating evidence upon which the people rely to sustain the conviction of defendant, and determine whether it is sufficient, under the section quoted, as construed by this court.

On Saturday night, March 7, 1896, Stephen Powell, a life-long resident and respected business man of the village of Hempstead, Queens county, Long Island, was murdered between eleven and half past eleven o'clock, while going from his store, on Main street, to his house, on Fulton street, a distance of only five or six blocks.   It was proved to have been a habit of deceased to carry about with him on his person considerable sums of money, and that this fact was more or less a matter of common knowledge in the community.   It appears by the undisputed evidence that the

deceased was the victim of a highway robbery, and that his death was caused by wounds inflicted when he was within a short distance of his residence. Mr. Powell left his place of business about eleven o'clock, stopped at a grocery store at the corner of Main and Fulton streets, made some purchases, and departed for home a little after eleven o'clock, in company with two friends, who accompanied him to within a block and a half of his residence, when they left him. This way about eleven o'clock. At about 11:18 o'cloch a witness named Hines passed the deceased, who at that time was within 100 yards of his home. Five minutes or less later, one Lowe, who lived a little further up Fulton street than the deceased was on his way home, and found Powell lying on his back on the sidewalk, insensible, his legs partially drawn up, his arms outspread, his overcoat, coat, and vest open, the buttons of the latter torn off, and the right-hand trousers pocket turned inside out. Help was immediately summoned. The victim was carried into his own house, and expired, without regaining consciousness, in less than half an hour after the assault. The robbers, in their haste, did not secure all the money that the deceased had with him, as fifty dollars werr found in one pocket, and sixty dollars in another. The defendant and his alleged accomplice are young colored men, of rather unsavory reputations, having been several times convicted of misdemeanors and shown to have been frequenters of places of low resort, and consorters with those of both sexes whose characters were questionable.

Waynes, the accomplice, was an unwilling witness; and it is evident, on reading his testimony, that he did not give a full and accurate account of the transactions and conversation between himself and the defendant during the last forty or fifty minutes preceding the murder, which must have taken place between 11:15 and 11:20 o'clock. It is admitted by both the defendant and Waynes that they were together in saloons and on the street until half past ten o'clock on the night of the murder. So it is unnecessary to refer to a large amount of evidence relating to the movements of these two men prior to that time. As to the all-important hour between half past ten and half past eleven o'clock on the night in question the stories of the defendant and Waynes are in sharp and direct conflict. Waynes says that at about half past

ten o'clock the defendant stated, when they were standing together on the street, that " he would like to have some money tonight"; but the district attorney was unable to elicit from the witness any further conversation or evidence of a scheme looking to the way-laying and robbing of the deceased.   Waynes states that he and the defendant passed along over a certain route that brought them near the corner of High and Fulton streets, being a point where the deceased would pass on his way home from the store, and that presently they saw him approaching, and, when he crossed High street, defendant told Waynes to come along, and they followed their victim.   The defendant was in advance, and Waynes saw him take something out of his pocket that looked like a black stocking hanging limp, with a bunch on one end of it, wrap it around his hand, and, when within two or three steps of the deceased, he swung it in the air, and struck him on the head, felling him to the ground.   It may be remarked here that the attending physician testified that the skull of the deceased was fractured by a blow from a stone or some blunt instrument.   Waynes further stated that deceased was lying on his face, and that defendant turned him over on his back, and rifled his pockets, while he (Waynes) kept watch, and then both ran away.   It is impossible, in the absence of a map of the locality, to trace intelligently. by streets the route of flight from the scene of the homicide to Clemens' saloon, which seems to have been the objective point of these two men. It will suffice to refer in a general way to certain incidents occur-ing prior to and during this flight, which are claimed on behalf of the people to corroborate the testimony of the accomplice in a most satisfactory manner.   The statement of Waynes that he and the defendant were in the immediate locality of the homicide a few moments before it took place is corroborated to some extent by the testimony of Mirando, a barber, and Mary Hickey, who, from different standpoints and just prior to the murder, saw two colored men in the vicinity, one seven or eight inches taller than the other.   The defendant is much taller than Waynes.   Accord-ing to Waynes' story, he and the defendant, in the early part of their flight, passed the corner of Jackson street and Terrace avenue; and one Treadwell swears that at 11:20 o'clock, when going up the front steps of his house at that point, he saw by the electric light

two men running, and his sister, who was sitting at the back parlor window between 11 and 11:30 o'clock, saw two men running down Jackson street, towards the house of Alanson Abrams. Waynes says that, when near Abrams' barn, defendant asked him for his knife; that he took it from his overcoat pocket, where he carried his pipe and gave it to him; that defendant cut the stocking, threw it in the road, and they continued their flight on across Main street to the railroad yard. It is to be remarked, in passing, that the coachman of Abrams found the stocking, a tobacco bag, and Waynes' pipe, with the latter's name carved on it, the next morning, in front of Abrams' barn, and, further on, two stockings, one of which had been cut. Mrs. Brower and her daughter, at the trial, identified these stockings as given by them to defendant's alleged wife in February, 1896, being the month before the murder. Waynes swears that, when they passed through the railroad yard, they saw a man at the engine house. At the trial, an engine cleaner, who was on duty at the engine house the night of the murder at about 11:30 o'clock, swore that he saw two colored men pass, one larger than the other, and the larger man had on a light overcoat, and the smaller one wore either rubber boots or shoes. This description of dress agrees perfectly with the manner in which both were attired on the night in question. Waynes, continuing his narrative, says that, after leaving the railroad yard, they ran down Fulton street, to the church and old burying ground; that defendant at this point made the motion of throwing something away twice; and that he (Waynes) heard some object strike the gravestones with a "clink." At the trial it was shown that detectives, after Waynes had made a confession, searched in the churchyard, and found the large key of the murdered man's store, and a round stone unlike any others to be found there. The attending physician of the deceased swore that this stone could have produced the fatal injury. Waynes concludes the account of the flight by stating that further on they met certain of their companions in the street, and finally brought up in Clemens' saloon. This latter statement is corroborated by at least four witnesses.

It is unnecessary to go over defendant's story in detail. He swears that he parted from Waynes at half past ten o'clock on

the night of the murder, and did not see him again until he met him, with others, in front of the town hall, about half past eleven o'clock. He denies in the most positive manner, generally and in in detail, Waynes' account of the murder, and subsequent flight, implicating him, and avers that he was not present when Stephen Powell was stricken down and robbed. The only corroboration of this attempt of the defendant to prove an alibi is found in the testimony of Edward Dorsey, who swears he saw the defendant on the night of the murder, at six or seven minutes past eleven o'clock, in front of the town hall, and he asked him what he was doing there, and he said he was waiting for John Waynes. The witness then went home. On cross-examination, Dorsey swore that he had never mentioned the fact before he testified of seeing the defendant at this time to any one, not even to defendant's counsel. The improbable story of this witness was considered by the jury, and evidently discredited. If the defendant had stood for an hour on the street, as he claims, in the busy part of the town, on a Saturday night, it seems quite incredible that he should be unable to prove the fact by only one witness. On the morning after the murder, the defendant and Waynes were arrested, taken before the coroner, examined, and discharged. The defendant immediately afterwards, in company with a woman who lived with him as his wife, went to Roslyn, to see his mother, with, as he claims, only two dollars in his pocket. At Mineola they were too late for the train, and decided to drive over to Roslyn, and a bargain was made for a conveyance with James McGuire, the bartender of the Mineola Hotel, defendant agreeing to pay $1.50. McGuire was sworn at the trial, and testified that, when defendant paid him, he pulled out a handkerchief, and took from it the money, and that there was still money in the handkerchief when he folded it again. This witness could not say how large the roll of bills was, but would only swear there was money in the handkerchief when returned to defendant's pocket. After arriving at Roslyn, defendant took his companion to the house of his mother, and, leaving her there, went to Pearsall's saloon. While there, Gildersleeve, a constable from Hempstead, entered the saloon. He had been sent over to rearrest the defendant. Before he did so, and while there, in the presence of the defendant, the latter sent

some one to his mother's house to borrow forty cents with which to pay for drinks he had ordered. Gildersleeve arrested the defendant, placed him in a wagon, and started for Hempstead. At this point a colored man named Tolliver came out of the house of defendant's mother, and, running after the wagon, asked Gildersleeve to allow the defendant to step back, as he wished to talk with him. Permission was granted, and defendant walked back to where Tolliver stood. The latter then said to defendant, "Your wife wants money to get home with." Tolliver swearing to this incident on the trial, said that defendant at first stated he had no money, but finally took a large roll of bills from his pocket, and hand it to the witness, who gave it to the woman known as defendant's wife. The defendant denied that he gave Tolliver any mor. y, and the mother and the woman with whom defendant lived swore that Tolliver gave no money to the latter, or any one else, when he returned after this interview with defendant in the road. It is claimed on behalf of the people that McGuire and Tolliver were disinterested witnesses, and that the jury were justified in believing that the defendant had a considerable sum of money on his person the day after the murder.

As before intimated, the important question in this case is whether the testimony of Waynes was corroborated by such other evidence "as tends to connect the defendant with the commission of the crime." Code Cr. Proc. § 399. Prior to the enactment of this section, a jury, if satisfied of the truth of statements made by an accomplice, could convict on his testimony alone. People v. Costello, 1 Denio, 83; People v. Dyle, 21 N. Y. 578; Dunn v. People, 29 id. 523; Linsday v. People, 63 id. 154. This section introduced a new rule of evidence. In People v. Elliott, 106 N. Y., at page 292, 12 N. E. 603, Judge Earl, in commenting on this section, said: "It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime, or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime. Nor need the corroborative evidence be wholly inconsistent with the theory of the defendant's innocence." If the trial judge is satisfied that there is testimony tending to connect the defendant with the commission of the crime, as the statute requires, he is bound

to submit the case to the jury, who are the sole judges whether the evidence relied upon to corroborate the accomplice is sufficient. People v. Everhardt, 104 N. Y. 591; 11 N. E. 62. In the case at bar, the learned trial judge, in a charge so absolutely fair that both sides were satisfied with it, told the jury that they were called upon to consider some direct evidence, some circumstantial evidence, and the confession of the accomplice, and he left it with them to ascertain the truth.

After a careful study of this record, we are of opinion that the verdict of the jury, convicting the defendant of murder in the first degree, is amply justified by the evidence. The corroborating evidence from the time the defendant and his accomplice approached the scene of the murder until the termination of their flight at Clemens' saloon is most persuasive and impressive, strongly illustrating that strange fatality which so frequently accompanies the commission of crime. It is also to be remarked that Waynes, the accomplice, did not testify with the promise of full indemnity, the record showing him to have been a most unwilling witness; and, after the verdict in this case, he was arraigned, and a plea accepted of manslaughter in the first degree.

The only exception argued in this case was as to the rejection of evidence offered on behalf of the defendant to the effect that certain disreputable companions of Waynes, in Hempstead saloons, on the night of the murder, were spending money freely the next day at an hotel in Wantagh. This evidence was wholly immaterial, and properly rejected. The judgment of conviction and order appealed from should be affirmed.

All concur. Judgment and order affirmed.


### NOTE ON "CORROBORATION OF AN ACCOMPLICE."

Testimony of an accomplice is admissible. State v. Crab (Mo. Sup.), 26 S. W. 548.

An accomplice is a competent witness for the prosecution. United States v. Ybanez (C. C.), 53 F. 536.

The uncorroborated evidence of an accomplice should be received with great caution. Woods v. Commonwealth (Va.), 11 S. E. 798; 86 Va. 929.

Such testimony should be received with caution, unless corroborated by unimpeachable evidence as to some material points. United States v. Ybanez (C. C.), 53 F. 536.

Testimony of an accessory after the fact need not be corroborated in order to sustain. People v. Chadwick (Utah), 25 P. 737. §§ 4391 and 4949 of Comp. Laws Utah make a clear distinction between an accomplice and an accessory after the fact. Id.

The uncorroborated evidence of an accomplice, if, when considered with the evidence, it satisfies the jury, beyond a reasonable doubt, of defendant's guilt, will support a conviction of larceny. Lamb v. State (Neb.), 58 N. W. 963; Jenkins v. State (Fla.), 12 So. 677; State v. Patterson, 34 P. 784; 52 Kan. 335; Woods v. Commonwealth (Va.), 11 S. E. 798; 86 Va. 929.

The degree of credit which ought to be given to the testimony of an accomplice is for the jury. State v. Patterson, 34 P. 784; 52 Kan. 335.

The judge, if requested, should advise the jury not to convict unless such testimony is corroborated by other evidence as to some material fact. State v. Patterson, 34 P. 784; 52 Kan. 335.

When witnesses introduced by defendant confess themselves to be confederates in the crime, the rule that a conviction should not be had on the uncorroborated testimony of an accomplice applies. United States v. Sykes (D. C.), 58 F. 1000.

Evidence in corroboration of an accomplice need not extend to the whole of his testimony. United States v. Lancaster, 44 F. 896.

Where it is shown that the accomplice has testified truely in some material particulars, the jury may confer that he has done so in others. United States v. Lancaster, 44 F. 896.

The truth of evidence, introduced to corroborate the testimony of an accomplice, and whether, if true, it tends to connect the defendant with the crime, are for the jury. People v. Bosworth, 19 N. Y. Supp. 114.

Testimony of accomplices, in misdemeanors, is sufficient to warrant a conviction. Rountree v. State (Ga.), 14 S. E. 712; 88 Ga. 457.

Testimony of an accomplice in a conspiracy need not be corroborated in every part of the act which goes to make up the offense. United States v. Howell, (D. C.), 56 F. 21.

It is sufficient if he is corroborated in some material fact. Id.

Though the jury may convict defendant of burglary on the incorroborated testimony of his accomplice, if they believe it to be true, such evidence, when not corroborated by some person not implicated, should be received with great caution, and the jury should be satisfied of its truth before convicting defendant thereon. State v. Minor (Mo. Supp.), 22 S. W. 1085.

Corroborating evidence, which does not tend to connect defendant with the crime, is immaterial. Conway v. State, (Tex. Cr. App.), 26 S. W. 401.

An accomplice can not be corroboroted by proof of declarations made after promises of immunity had been made, or after the hope of obtaining a light punishment by becoming a witness had entered his mind. Conway v. State, (Tex. Cr. App.), 26 S. W. 401.

The jury should convict, where story of the accomplice, taken with the other facts and circumstances in the case, carry conviction to their minds. State v. Burber (N. C.), 18 S. E. 515; 113 N. C. 711. They must be satisfied, beyond a reasonable doubt of the guilt of the defendant, before they can convict. Id.

Refusal to charge that, if a witness' testimony shows him to be an accomplice, the jury should not convict, unless his testimony is corroborated by testimony that they believe to be true, beyond a reasonable doubt, is proper. Vaughan v. State (Ark.), 24 S. W. 885 ; 58 Ark. 353.

Testimony of an accomplice, unless corroborated by other evidence tending to connect defendant with the crime, and not merely showing the fact and circumstances thereof, can not support a conviction. Vaughan v. State, 24 S. W. 885 ; 58 Ark. 353.

Such testimony, when uncorroborated by some person not implicated in the crime, as to matters connecting defendant with its commission, ought to be received by the jury with great caution. State v. Crab (Mo. Sup.), 26 S. W. 548.

The jury ought to be fully satisfied of its truth before convicting defendant on such testimony. State v. Crab (Mo. Sup.), 26 S. W. 548.

The jury are at liberty to convict on the uncorroborated testimony of an accomplice, if they believe his statements and that the facts sworn to by him establish defendant's guilt. State v. Crab (Mo. Sup.), 26 S. W. 548.

Section 399 of N. Y. Code, Crim. Proc. is complied with, if there is some other evidence fairly tending to connect defendant with the commission of the crime, so that his conviction will not rest entirely on the evidence of the accomplice. People v. Everhardt, 5 S. R. 793 ; 104 N. Y. 591 ; aff'g 4 S. R. 518; People v. Elliott, 8 S. R. 703 ; 106 N. Y. 288 ; rev'g 8 S. R. 223 ; People v. Sanborn, 14 S. R. 123.

In Missouri, conviction can be had on the uncorroborated testimony alone, if the jury, after being duly cautioned by the court, is fully satisfied that his testimony is true. 17 S. W. 301 ; 106 Mo. 174.

Testimony of one accomplice is not corroborative of that of another. Whitlow v. State (Tex. App.), 18 S.W. 865.

Where all the witnesses are accomplices, defendant cannot be convicted on the testimony of the accomplices, unless corroborated by other evidence. Whitlow v. State (Tex. App.), 18 S. W. 865.

The fact that the statement of three persons, who are jointly charged with a conspiracy,—one of whom makes a voluntary confession, another becomes a witness for the government under an implied promise of pardon, and the other makes a declaration during the pendency of the criminal enterprise, are, in all material respects, identical, is corroborative of the testimony of the accomplices, and of the credit of a witness who testifies to the declaration, in the absence of collusion or knowledge *inter sese* with reference to the several statements. United States v. Lancaster, 44 F. 896.

See notes on " Corroborative Evidence," 1 Federal and State Cr. Rep. 320 and 2 Silv. (Ct. Ap.), 512.