People of Puerto Rico, Plaintiff and Appellee, *v.* Ramón Marrero, *alias* Moncho, Defendant and Appellant.

No. 4202.   Argued June 27, 1930.—Decided March 18, 1931.

*C. Coll y Cuchi* and *H. Miranda* for appellant.   *R. A. Gómez* for appellee.

MR. JUSTICE TEXIDOR delivered the opinion of the Court.

A duly impaneled jury found Ramón Marrero guilty of murder in the second degree and the District Court of Arecibo, before which the trial was held, sentenced him to twenty-five years in the penitentiary at hard labor.  The present appeal has been taken by him from that judgment.

The pertinent part of the information in this case reads as follows:

"The said defendants, Ramón Marrero also known as Moncho, Carlos Colón and Olimpio Pérez, on the night of September 4, 1929, at a place known as 'Junco' in the ward of Hato Abajo, Arecibo, P. R., within the judicial district of the same name, then and there, unlawfully, wilfully, maliciously and criminally, with malice aforethought and deliberate intent to kill, attacked, assaulted and tortured Antonio Rivera (a human being), inflicting several wounds in his skull and body with a hoe, one of which wounds (that inflicted in the right occipital region of the skull which was fractured) caused the unlawful death of the said Antonio Rivera, which occurred then and there shortly thereafter."

Dr. Pablo Curbelo, while testifying, was asked by the district attorney if he had examined the body of Antonio Rivera, and he answered in the affirmative, that he had made a post-mortem examination.   Counsel for the defense objected to the question unless the district attorney first connected the place where said examination was made, or if such place was not the same as that in which the crime was committed, unless he connected the latter place with that where the

autopsy was performed, so as to establish whether the doctor had had the body removed, or whether between the removal of the body and the time of the intervention of the doctor somebody else had had anything to do with the body. The court overruled the objection and the defense took an exception. Now in his argument under the first assignment of error the appellant contends that it has not been shown that the body on which the autopsy was performed was that of Antonio Rivera.

The record (the testimony of Fuentes, Maldonado, Justo Marrero and López) shows the identification of the body of Antonio Rivera as far as this was humanly possible. Dr. Curbelo, unless he personally knew Antonio Rivera, had no other means for his identification than the report made by the caretaker (*celador*) of the cemetery where the body was kept; it is not the case of a wounded person to whom questions may be put in the hope of receiving an answer.

We can not agree that the error assigned exists.

The second error assigned is that the court allowed District Attorney Pérez Casalduc to testify regarding the preliminary investigation made prior to the filing of the information.

To base our decision it is necessary to transcribe from the record what took place at this stage of the trial, as follows:

"Eduardo Pérez Casalduc, having been duly sworn, testified:

"My name is Eduardo Pérez Casalduc and I am the District Attorney of Arecibo. During the preliminary investigation in this case made by me when resuming my work after a vacation, I summoned on one occasion the defendant Ramón Marrero to appear before me, and I had a talk with him in regard to the crime and he explained to me all his movements on that night, that he had been to a show, and told me that on reaching his home. . .

"Attorney Coll y Cuchí.—I object to the testimony of the district attorney insofar as it refers to the defendant, unless he states under oath that he had informed Marrero that he was the district attorney and that any statement that he might make in his presence might

be used against him in a court of justice as an admission or confession.

"District attorney.—No confession of the defendant is involved but mere statements from him, which is not the same thing as a confession.

"Attorney Coll y Cuchi.—Statements from a defendant made to a person other than a public officer are voluntary; but when made to a public officer it is necessary that he should be advised that he is making them to an officer.

"District attorney.—If the statements amounted to a confession, I would agree that the theory of counsel for the defense is correct; but I am not trying to bring in a confession of the defendant but a statement from him which does not incriminate him if considered by itself.

"Judge.—The court overrules the objection of the defendant based on the holdings in People v. Quintana, 39 P.R.R. 181, and People v. Valle, 29 P.R.R. 516.

"Attorney Coll y Cuchi.—Exception.

"Judge.—Proceed.

—"He told me that on reaching his home he met only his mother and another woman who was living with him and whose name is María Abreu, and Bilí, but that Marcos Maldonado was not there; I always insisted that Marcos Maldonado was present and he repeatedly denied that Marcos Maldonado was at his home when he arrived from Arecibo. A few days afterwards I noticed that Bilí, whose name is Eleuterio Rivera, had not been examined and I sent a detective to bring him to me. He admitted what I have just stated, that Marcos Maldonado was at his home when Moncho Marrero arrived from town, and, as this was in conflict with the statements of the defendant and of Marcos Esquina, I sent for him and confronted them; and Eleuterio Rivera insisted on his statement in the presence of Marcos Esquina.

"Attorney Coll y Cuchí.—I object to that statement about the confrontation.

"Judge.—Unless the court is convinced, that will not be admitted.

—"In this situation, we proceeded to examine Marcos Esquina, who finally said that he would tell the truth voluntarily. This took place between 7 and 7:30 p. m. I brought him to this same court room and in the presence of witnesses Pedro Orpi and this Mr. Nolla, of the Custom House, he testified, without any intimidation whatever and without any offer on my part. I must also state that

upon taking charge of the preliminary investigation I went to the ward of Junco with two policemen and two detectives. I did not know the defendant until that day, and we got to a store in the ward of. . . .

"Attorney Coll y Cuchí.—I want to object again to the district attorney's testifying to the substance of a preliminary investigation made, since what he can do is to bring the evidence, but not repeat orally what the preliminary investigation revealed. He can take the stand to contradict a witness, who has made statements to him, but not testify regarding a testimony which is in his hands, which he can reproduce, because that would amount to depriving me of my right to cross-examine.

"District attorney.—I am not trying to introduce any testimony. What I am trying to bring out is the demeanor of the defendant during the preliminary investigation, which is admissible in evidence.

"Attorney Coll y Cuchí.—The witness stated that certain testimony given before him agreed with testimony given here. It lies heavily on my conscience. I know that the only evidence sought to be brought here before the jury is the testimony of an accomplice and that of the district attorney. That is repellent to my conscience as counsel and to my training as an attorney.

"Judge.—Undoubtedly, the district attorney can not bring to the knowledge of the jury facts which he can and must establish by any evidence in his possession. This does not mean, however, that no evidence can be introduced in regard to the conduct of a defendant at or about the time when the alleged facts occurred. In these circumstances, the court directs the witness not to refer to any fact, circumstance or statement regarding things or incidents that may be established by other evidence and that he must confine his testimony, if it can be given and is admissible for the purpose stated by him of establishing or fixing the attitude of the defendant during the days to which we have referred.

"District attorney.—That is my only purpose, which I announce thus: The statements which I want to make, what I seek to bring before the jury is the behavior of the defendant during the time of the investigation, which I conducted; what I noticed in him and what he did during that time, but not statements, because I am not going to refer to statements from him other than those I mentioned but to his behavior.

"Judge.—Proceed.

—"On the same day I took charge of the investigation, I went

to the ward of Junco and in a store on the Junco road belonging to a person known as Inés Colón Marrero was the defendant, whom I saw for the first time. My attention was called to him and I noticed that, as soon as he saw me, he grew pale. He had a paper in his hand. . .

"Attorney Coll y Cuchí.—I wish at least to put on record my objection to those statements of the district attorney made here while testifying. We have gone back to Torquemada's times. The statement from the district attorney that the defendant grew pale at the sight of him can not possibly be admitted in evidence.

"District attorney.—I can produce jurisprudence.

"Judge.—Objection sustained.

—"On the night when Marcos Esquina was brought in, that I examined him, he was confronted after the examination, with defendant Ramón Marrero in the marshal's office, which was in that corner of this very building. Ramón Marrero was sitting in a chair near Marcos Maldonado; I sat between the two, detective Colón being also present. Marcos Esquina described in the presence of Ramón Marrero how the act, the crime, was committed.

"Attorney Coll y Cuchí.—I object to the statements of the district attorney in regard to the defendant being confronted with that witness, under the ruling of this court.

"Judge.—I do not think I have heard the district attorney say that a confrontation took place, but that while the defendant was present, the witness, Marcos Maldonado, made the statements testified to here.

"Attorney Coll y Cuchí.—That is a confrontation.

"Judge.—In that case the court would overrule the objection on the authority of People v. Millán, 35 P.R.R. 817.

"Attorney Coll y Cuchí.—If it is an argument between the defendant and a witness, it is a confrontation.

"District attorney.—In order to show that the statements from Maldonado were heard by the defendant.

"Attorney Coll y Cuchí.—We have no objection to that.

—"Marcos Maldonado recited all the details of the crime in the presence of the defendant Ramón Marrero. While Marcos was giving an account of the crime I said to Marrero: What about it, Marrero?

"Attorney Coll y Cuchí.—That is confronting them with each other. We object to the district attorney's stating the result of a confrontation which took place in an office of the court and in his presence between the defendant and a witness, since he asked the former: 'What do you think of the testimony?'

"Judge.—Objection overruled on the grounds set forth in People v. Millán, *supra*.

"Attorney Coll y Cuchí.—Exception.

—"As I said before, after Marcos Maldonado had related the particulars of the crime in the presence of the defendant and within his hearing, there was a moment when I said to him: Marrero, what about it? And he said: Whom do you mean? And Marcos said: Whom can he mean? You. The reaction of Marcos to that statement was to smile without saying a word. I also wish to state that I went to the place of the occurrence and made a diagram of it, which I have in my possession, showing the spot where the body lay, the house of Ramón Marrero, . . .

"Attorney Coll y Cuchí.—We object to the production of the diagram and to any reference to it by the district attorney, because it is not a part of the *res gestae*, as it was not made a few moments after the commission of the crime, without any alteration of the place of the *corpus delicti*.

"District attorney.—That question has been decided by the Supreme Court in People v. Morales, in which a photograph made a few days afterwards was admitted. The jurisprudence is the same as regards diagrams, maps, photographs.

"Attorney Coll y Cuchí.—In a civil proceeding a diagram can not be admitted if the opposing party has had no intervention in the making of it. How can a diagram made by the district attorney without the intervention of the defendant and long after the commission of the crime possibly be admitted? A photograph is an exact reproduction whereas a diagram may be unintentionally changed.

"Judge.—Objection sustained.

"Attorney Coll y Cuchí.—We have no question to ask."

It is true that there is risk in allowing the officer making a preliminary investigation in a criminal case to testify at the trial. He may unconsciously and involuntarily overstep the limits and tread upon forbidden ground according to the rules of procedure. The law seeks to safeguard the rights of the accused and in the face of such guarantee social or general rights must yield to a certain extent. But as everything has its limits, and as it is desireable that the jury who are going to render a verdict should possess reliable informa-

tion on which to base their belief and their findings, there are particulars as to which such testimony may be admitted. During his testimony the district attorney said.

"District attorney.—In order to show that the statements from Maldonado were heard by the defendant."

The defense stated:

"Attorney Coll y Cuchí.—We have no objection to that."

It was proper for the district attorney to testify to the fact that the statements made by Maldonado during the preliminary investigation were heard by the defendant, and similarly in regard to the latter's attitude.

In *People* v. *Millán, supra,* cited by the *Fiscal* of this court, it appears that Domingo Quiles was allowed to repeat before the jury certain statements made by Francisco Acevedo and to describe the demeanor of the defendant. This court said (p. 819):

"The appellant contends that the remarks made by Acevedo and repeated by Quiles were not admissible, because they did not refer to him and were not made in his immediate presence. However, the record shows that the remarks were made by Acevedo in a loud tone of voice; that the appellant was near; that he could hear them, and that he smiled when they were made; consequently it can not be held that Acevedo's remarks were not made in the appellant's immediate presence. It is true that the speaker used the plural and the words did not refer to himself alone, but Millán made no objection thereto, and, on the contrary, smiled, which may be taken as an acquiescence. And the said remarks made by Acevedo, who was also accused and convicted of raping the girl, were admissible also because they were not lacking in connection with the appellant's demeanor when they were made by Acevedo. In the case of People v. Mallon, 103 Cal. 514, where two witnesses were permitted to testify to certain statements made by Foran, who had been accused with Mallon of an attempt to commit robbery, the court held as follows:

" 'This testimony, standing by itself and without any connection with the conduct of appellant when the alleged statements were made, would, no doubt, have been clearly hearsay and inadmissible. But

it is established law that while a statement made in the presence of the accused is not admissible as being itself evidence of any fact narrated in such statement it is admissible, primarily, for the purpose of showing that the accused acquiesced in the statement either by express assent, or by silence, or by such conduct as fairly implied assent. (People v. McCrea, 32 Cal. 98; People v. Estrada, 49 Cal. 171.) Such testimony should, no doubt, be received guardedly; if not followed by any proof of the conduct of the accused it should be stricken out; and if requested by the defendant's counsel (which was not done in the case at bar) the court should instruct the jury that such statement was limited as evidence to the purpose above indicated. But it is not error to admit such statements in the first instance. In the case at bar we think that it clearly appears what the conduct of the defendant was when Foran was making his statements, and that he did not deny them. During the testimony of Crockett as to said statements, and after an objection had been made by defendant's counsel, the court said: ''I assume that what the defendant at bar said and did in the course of that conversation will come out''; and the court then asked the witness: ''What did the defendant here on trial—what did he say?'' to which the witness responded: ''He didn't say anything when he told him that,'' and the witness afterwards said: ''We were all together in one group. The defendant, Mallon, said nothing.'' The witness Donovan, after testifying to certain statements made by Foran to defendant, said that ''he didn't answer at all.'' And, further, that when the witness asked the defendant, ''you were there?'' he replied: ''Do you suppose I was a damn fool to tell you I was there?'' ' ''

It is unnecessary to cite further authorities in this connection to justify our conclusion that there was no error.

The third assignment reads as follows:

''Third error.—The court erred in denying the motion of the defendant for a peremptory discharge for lack of evidence.''

Under this assignment the appellant discusses the question of the testimony of an accomplice and the necessary corroboration.

We shall not go into the question as to how far can the belief be justified that an accomplice is ready to lie for his own interest when testifying. There was perhaps justifica-

tion for the advice given to the jury to be exceedingly cautious when weighing the testimony of the accomplice, but there would not be as much justification for extending a like treatment to the statute itself. Such is not the province of the courts. But, in any event, as the *Fiscal* of this court maintains, it has become necessary to subject the statutory provision in question to certain limitations judiciously established by the jurisprudence and which have been pointed out by the *Fiscal* in his brief. The most important among such limitations are those relating to the discretion of the court and to the latitude given to the jury when weighing the evidence.

Marcos Maldonado, an accomplice, testified that he had met the defendant Moncho Marrero, one night, prior to the death of Antonio Rivera, and that Moncho had told him that he was going to get Rivera's money and that he wanted the witness and Olimpio Pérez to keep a watch. He told him to fetch Olimpio and Carlos Colón for them to go to Justo's house, to call him there and tell him that someone was stealing his hens, to see if he fired any shots, and then to wait at the entrance to the lane; all which the witness did. They went and called Justo Colón Marrero and told him that somebody was stealing his hens, and while he was getting up they ran away to the lane where the defendant was waiting for them with a hoe. He posted Olimpio below and the witness higher up and sent Colón to call Rivera, while he was bringing the cow outside, and they did as directed; that Rivera got up and came after the cow, which Moncho had tied to the root of a cupey tree which he climbed; that Antonio Rivera on arriving went to let the cow loose and Moncho, from above, struck him with the hoe; and Colón seized the machete which Rivera was carrying and attacked him with it while Moncho was striking him with the hoe. Rivera fell shouting: "Moncho, do not kill me," and when Rivera no longer moved they searched him and took from him a purse with money in it, and a revolver, leaving him

there. They divided the money among themselves in the house of Carlos Colón.

The witness, Justo Marrero, testified that during the night between the 4th and the 5th of September, at about 3 or 4 a. m., he got up for the milking and at 5 a. m. he went to town to get bread and on returning he saw several people, and in a ditch he saw the body of Antonio Rivera next to a slope and the handle of a hoe, and a cow tied up to a cupey tree; that the night before the crime he went to bed early, heard the dogs barking about 11:30 p. m. and got up and fired two shots from the balcony. He noticed that his nephew's house in front of his was lighted.

Eleuterio Rivera, or Bilí, an uncle of the defendant, tes-- tified that the night before the killing of Antonio Rivera he saw Marcos Maldonado at the house of Moncho, the defendant, where he remained until ten o'clock, at which time Moncho arrived; that they did not talk and that Moncho Marrero went to bed and slept in the house.

Eladio López Torres testified that, after the killing of Antonio Rivera, he saw Moncho Marrero who occasionally went to the witness's store and once, when questioning him about the hoe, Marrero said: "That hoe has my name on it, but there are many Monchos."

Francisco Rivera Clasen, a brother of Antonio Rivera, in his testimony referred, among other particulars, to a quarrel between his brother and Moncho over a certain lease of a house; and he also mentioned that his brother had money and carried it on his person in two cloth and rubber purses, and that it amounted to about three hundred dollars.

Francisca Miranda, the concubine of Eustaquio Rivera, *alias* Bilí, testified that on the day after the crime Moncho Marrero came to her house and told her that he would not go in because he was still nervous, and on her asking him why, he questioned her as to whether she had not heard of the crime and explained to her the manner in which it was supposed it had been committed; that he supposed the man had

been called to set free a cow which was being stolen from him, that he got down, and while he was unfastening the cow he was struck from above; that the cow had been tied up high so as to strike him from above while he was untying the knot; that Moncho came up again on Sunday and the witness was in bed and he inquired about her, and afterwards they talked downstairs, and in jest someone said: "Say that you killed him, don't deny it," and that she does not know how many were there.

Eustaquio Rivera testified that he saw Moncho Marrero at Paca's house in the evening of the day on which the crime was committed, and then on another occasion when he went with several others, among whom was one of the defendants, and that on that night they knocked and inquired about Paca, who was sick, and they went away; that he heard them joking and somebody saying: "It was you who killed him"; that he thinks that they were drinking.

In addition to the above, there was other testimony in which further interesting points were brought out.

Dr. Curbelo testified to the autopsy. The most important part of his testimony referred to the wounds observed in the body consisting of a bruise in the right occipital region with a fracture of the skull; another sharp wound between the frontal and parietal regions; a fracture of the right lower jawbone; fracture of the ulna of the right arm; two sharp wounds in the left arm; destruction of the right occipital lobule of the skull; hemorrhage, etc.

Policeman Guillermo Fuentes testified that on the morning of September 5 he was notified of the crime, went to the place and found the body of Antonio Rivera on the Junco municipal road, in a ditch, at a place where the said road lies between two ravines; that the place where the cow had been tied and where marks of machete blows could be seen is rather high; that the cow was tied up to the root of a tree, he does not know whether it was a hicaco tree; that he

found a hoe, a broken handle of a hoe smeared with blood and dirt. He recognized the hoe shown to him.

Policeman Manuel Barrios, who also went to the place where the body was found, saw the hoe and fixed up the handle; he testified to the fact that there was written on it, in pencil, a word which was either "Moncho" or "Maldonado." He recognized the hoe shown to him.

When the prosecution rested, the defense moved for a directed verdict on the ground that the testimony of an accomplice is not sufficient unless corroborated by other evidence, and that corroboration did not exist in this case. The motion was denied by the court, and the defendant declined to introduce any evidence in his behalf.

The instructions given to the jury were carefully worded, and full. All the necessary points were covered and the court complied with the law and the jurisprudence. The following instruction referred to the testimony of the accomplice:

"From the evidence given before the district attorney there appears the testimony of a witness whose name is Marcos Maldonado. The defendant has argued that Marcos Maldonado is an accomplice and that his testimony should be corroborated by some other evidence. The court instructs the jury that Marcos Maldonado is indeed an accomplice in the crime, with which this defendant is charged. As he is an accomplice, it is necessary that his testimony be corroborated. The testimony of an accomplice must be corroborated by some other evidence which in itself and without the aid of the statements from the accomplice tends to connect the defendant with the commission of the crime. The corroboration required is, therefore, such evidence as may tend to show the connection of the defendant with the commission of the crime irrespective of the testimony of the accomplice. The corroborative evidence must not necessarily be direct evidence; as it might well be circumstantial evidence. But such corroborative evidence must always tend to show and must show to your mind the guilt of the defendant or be sufficient to connect him with the commission of the crime, such corroboration not being sufficient if it only shows the commission of the crime or the circumstances thereof.

"The testimony of an accomplice is corroborated when, irrespective of the evidence of the accomplice, there is evidence tending to connect the defendant with the crime with which he is charged. The following is suggested as being adequate: Disregard the testimony or evidence given by the accomplice, and then examine the testimony of the other witnesses with the object of determining whether there is incriminating evidence, evidence tending to connect the defendant with the crime. If there is, then the accomplice is corroborated. If there is no incriminating evidence, there is no corroboration, even though the accomplice might be corroborated with regard to any other facts sworn to by him. This theory rests on the following legal provisions contained in section 253 of the Code of Criminal Procedure: 'A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.' The court instructs the jury that the evidence required to corroborate the testimony of an accomplice must be of such nature that it tends to connect the defendant with the commission of the crime.

"If the jury think that, after striking out the testimony of the accomplice, Marcos Maldonado, there is left sufficient evidence to convict the defendant, then it is the jury's duty to convict him and to bring a verdict accordingly. But if you think that, after disregarding the testimony of Marcos Maldondo, there is not sufficient evidence to justify the conclusion that this defendant committed the crime with which he is charged, then you must bring in a verdict of not guilty. In order to convict the defendant, it is not enough that you believe the testimony of the accomplice, that he has spoken the truth. It is necessary that the other testimony of itself be sufficient to connect the defendant with the crime, irrespective of the testimony of the accomplice. And if you think that the testimony of the other witnesses, alone, without that of the accomplice, is insufficient to connect the defendant with the crime, I say again that it is your duty to acquit him.

"Francisca Miranda when testifying repeated certain statements as having been made by the defendant. The court admitted those statements as evidence for the consideration of the jury, whom the court instructs that if after considering the evidence as a whole they are of the opinion that such statements were not voluntarily made

by the defendant, they should reject the same or otherwise admit them in order to give them the probatory value which they may merit, it being likewise for the jury to determine the credibility of the witness who testified as to such statements. Statements attributed to a defendant must have been made freely and voluntarily, without his having been induced to make them through any threats, violence, incentive, undue influence or promise on the part of an officer or expectation of a lighter punishment or any benefit to be derived by the declarant.

"In regard to certain evidence of a circumstantial nature offered in this case, I must instruct the jury that there are two kinds of evidence recognized and admitted by the courts of justice, by virtue of either of which the jury may convict a defendant of a crime. One of them is the direct or positive testimony of an eyewitness with respect to the commission of a crime. It is called direct evidence. The other evidence is that resulting from the proof of a series of events connected with each other and tending to prove, in a sufficiently strong manner, the commission of the crime by the accused. This is known as circumstantial evidence. It may consist of plans made for the perpetration of the crime, or of any act, statement, or circumstances, admitted as evidence, tending to connect the accused with the commission of the offense. There is nothing in circumstantial evidence to make it less reliable than the other kind, that is, direct evidence. The court instructs the jury that in order to convict the accused on circumstantial evidence it is only required that all the circumstances should concur in showing that he committed the crime charged, and that they are inconsistent with any other reasonable conclusion. It is not sufficient that the circumstances proved coincide, agree and render probable the theory advanced to prove the accusation. They must exclude any other theory but that of guilt. That is, where circumstantial evidence is involved, facts must be shown which are not merely consistent with the guilt of the accused but inconsistent with every reasonable theory of his innocence; and each isolated fact from which the guilt is to be inferred should be proved by means of evidence satisfactory to the mind and conscience of the jury in the same degree of satisfaction required with respect to the fact in question in cases where the proof is made by means of direct evidence."

Both the appellant and the appellee, in extensive and well reasoned briefs, have argued this point, and have made

numerous citations of authorities which we shall not reproduce here.

To our mind, the jury found the necessary corroboration to arrive at a conclusion and to render a verdict satisfactory to their conscience as individuals and as triers of facts in the following particulars:

The testimony of Francisca Miranda and of Eleuterio Rivera.

The hoe, and the testimony regarding it, as well as the place where the cow had been tied; the marks of machete cuts at the place where the body was found.

Especially, the conversation between the defendant and the witness, Francisca Miranda.

Of course, these elements, alone, do not establish in a conclusive manner the guilt of the defendant, Marrero; if that degree of proof were required, society would have to give up the prosecution of offenders in the cases where no eyewitnesses could be produced, criminals not being in the habit of taking such witnesses with them to act as observers.

In *People* v. *Robles*, 13 P.R.R. 299, this court held:

"It is not necessary that corroborative evidence be direct evidence because it may very well be circumstantial so long as it shows the guilt of the accused or is sufficient to connect him with the commission of the crime."

In *People* v. *Mayhew*, 150 N. Y. 346, 44 N. E. 971, we find the following holding, which the Fiscal of this court has summarized in his brief thus:

"The corroboration of the testimony of an accomplice in a prosecution for murder is sufficient under section 399 of the Code of Criminal Procedure of New York—providing that the corroborating evidence must tend to connect the defendant with the commission of the crime—where the testimony of said accomplice as to the time when the crime was committed is corroborated by other witnesses; his statements in regard to the weapon used is corroborated by the character of the fatal injury and the discovery of various articles as to which he had testified, found in the places where he stated the

954

defendant had thrown them; there is other evidence tending to connect the defendant with certain portions of the weapon found, and a key belonging to the deceased is found where, according to the accomplice's testimony, the defendant had thrown it; and, the deceased's pockets having been rifled, it is shown that the defendant, shortly after the crime was committed, had in his possession a certain amount of money.''

On whom is it incumbent to determine the sufficiency of the corroboration? It seems to us that if the corroboration must give rise to a belief on which to base a decision, the determination of its sufficiency should be left to those who must form that belief in order to decide. The function can not be subjected to technical rules; it is a mental process. We can not leave the jury to find their way in a sea of technicalities. Technical rules are proper to keep from the jury what should not reach them, but not to control the verdict, which must reflect the candid opinion of the twelve judges of fact.

No contention is made that the verdict is vitiated by any error in weighing the evidence.

The error assigned has not been committed.

For the foregoing reasons the judgment appealed from must be affirmed.